YOUNGER R. DENNY, Executor of Estate of JOSIAH C. WOLCOTT, Appellant, v. MARGARET A. GUYTON, FANNIE G. CARKENER and J. FRANK GUYTON, Executors of Estate of J. D. GUYTON, and H. M. BEERS and W. R. HARRINGTON.—40 S. W. (2d) 562.

Court en Banc, May 27, 1931.*

*NOTE:    Opinion filed at October Term, 1930, March 3, 1931; motion for rehearing overruled at April Term, May 27, 1931.

1032

*J. M. Johnson, Watson, Gage & Ess, Reed, Holmes & Taylor, J. P. Aylward, Donald W. Johnson* and *Henri L. Warren* for appellant.

*Madden, Freeman & Madden, Edw. J. White, Ryland, Boys, Stinson, Mag & Thomson* and *Geo. L. Edwards* for respondents.

1040

ATWOOD, J.—This case comes to the writer by reassignment after a second hearing by the Court en Banc. It is an appeal from an order and judgment by the judge of the Circuit Court of Jackson County entered September 12, 1927, at the September, 1927, term, sustaining motions of J. D. Guyton, H. M. Beers and W. R. Harrington for a new trial and in arrest of judgment and setting aside judgment for $1,352,568.41 rendered against them December 24, 1926, at the November, 1926, term, by his predecessor in office who tried the cause. The proceeding was a suit in equity there commenced January 18, 1922, by Josiah C. Wolcott against J. D. Guyton, H. M. Beers and W. R. Harrington, individually, and the administrators of the estate of J. M. Grant, deceased, to set aside a contract of sale, secure an accounting and obtain a money judgment for plaintiff. Josiah C. Wolcott died testate on or about November 2, 1922, before the suit came to trial, and it was revived in the name of Younger R. Denny, his executor. The trial began December 28, 1925, and ended February 16, 1926. The case was taken under advisement until December 6, 1926, when the trial judge filed an opinion finding the issues for plaintiff. Before judgment was entered plaintiff dismissed as to the administrators of Grant's estate. J. D. Guyton died testate December 24, 1930, whereupon the cause was duly revived against Margaret A. Guyton, Fannie G. Carkener and J. Frank Guyton as his executors.

Appellant's abstract of the record consists of more than two thousand pages of printed matter, and many original exhibits have been filed here for our examination. The evidence embraces a history of years of intense business activity involving the expenditure of many millions of dollars and resulting in correspondingly large profits. Preliminary to our consideration of the issues, which relate to sufficiency of the petition to state a cause of action, sufficiency of the evidence to prove the allegations of joint adventure and fraud, and propriety of the accounting had, we shall indicate rather fully the import of the pleadings.

Plaintiff went to trial on his amended petition, filed December 10, 1925, which alleged in substance that, prior to September 1, 1914,

Wolcott, Guyton, Harrington, Beers and Grant had been extensively engaged in the business of buying and selling horses and mules and had large stations and plants at Kansas City, Lathrop and St. Louis, Missouri, and other places, which stations and business enterprises were being conducted in the names of three different Missouri corporations, to-wit, The Guyton and Harrington Mule Company, Stock Yards Horse and Mule Company, and Wolcott, Beers and Grant Horse and Mule Company. The stockholders, directors and officers of said corporations consisted, in a large part of the same persons, the entire capital stock of said Guyton and Harrington Mule Company being owned by said Guyton and Harrington, and the entire capital stock of the other two corporations being owned as follows: Guyton and Harrington one-fourth each, and Wolcott, Beers and Grant one-sixth each. After September 1, 1914, other corporations and partnerships were organized and entered into for the more convenient handling of said business as follows, to-wit: A certain Missouri corporation known as Womack & Nichols Mule Company, controlled by said five parties, was reorganized and its corporate name changed to Womack and Stroud Mule Company, the stock being owned by said parties in the proportion of one-fourth each by said Guyton and Harrington and one-sixth each by said Wolcott, Beers and Grant; a partnership was formed known as Biddle and Company in which a part of said horse and mule business was conducted by said parties under an arrangement subsequently pleaded by which they were to share the profits of said business; parts of said business were conducted by them under various trade names, among them the trade name of C. & A. Company, and the name of Wolcott, Beers and Grant; and a certain partnership was formed between said Guyton and one Reed, Tough and others, known as the C. & A. Horse Company, and the profits accruing therefrom to the said Guyton were to be shared by him and the said Harrington, Wolcott, Beers and Grant as further set forth in the petition.

The petition further alleged that about September 1, 1914, and after the beginning of the World War, "pursuant to an understanding and arrangement between the said Guyton, Harrington, Wolcott, Beers and Grant, the said defendants, Guyton and Beers, at the expense of the Stock Yards Horse & Mule Company, went to Montreal and entered into an arrangement with the British Government through the Commanding Officer of the Remount Commission of said Government at Montreal whereby large purchases of horses and mules were made by said Government with the said J. D. Guyton, and in view of the enormous increase in their business, resulting from said purchases, and in contemplation of a further enormous increase in the purchase of horses and mules by the British Government and other belligerent allied powers, which were then engaged in the War

or which might afterwards come into the War as allied or associated powers, and for the more convenient and adequate financing of said enterprises, which required an enormous amount of borrowed capital, exceeding the borrowing capacity of the said Guyton, Harrington and Beers, and for the more convenient and simple handling of said business, and the division of the profits thereof, and for the more effective concentration and employment of all the resources of all the parties and corporations which they owned and to enable the said parties to form, use and employ other corporations, partnerships and trade names in adequately meeting the demands of such enormously expanded business, the said Guyton, Harrington, Wolcott, Beers and Grant engaged together under an oral agreement as joint adventurers in the business of buying and selling, and generally dealing in horses and mules throughout the United States and in foreign countries, and agreed that the said joint adventure should include all of the business thereafter transacted by the said mentioned individuals, corporations, partnerships, trade names, and any other corporations or partnerships thereafter formed by said parties, and that the profits realized to said parties from the operation of all such corporations, partnerships and trade names should be pooled and divided among the said joint adventurers on the basis of a division to the then stock ownership of each of said parties in the capital stock of the Stock Yards Horse & Mule Company, to-wit: One-fourth to each the said J. D. Guyton, and W. R. Harrington, and one-sixth each to the said H. M. Beers, J. M. Grant and Josiah C. Wolcott, and it was further agreed that the said joint adventure should continue as long as said corporations, partnerships or trade organizations, or any of them would be engaged in the business of supplying horses and mules to the British Government or to any of the allied or associated powers engaged in the War.''

The petition further alleged that said joint adventure continued from on or about September 1, 1914, to on or about January 1, 1918, during which time said business of supplying horses and mules to the belligerent allied and associated powers was handled and conducted through the various corporations, partnerships and by means of various trade names above set forth; but prior to the termination of said business and on or about the — day of September, 1915, ''the said Josiah C. Wolcott was stricken by a severe illness from which he never fully recovered, and which terminated in his death on or about the 2nd day of November, 1922, and the defendants, Guyton, Harrington and Beers took advantage of his illness, which it was thought at the time would shortly end in his death to defraud said Josiah C. Wolcott as hereinafter set forth out of his share of the profits earned by the said various corporations, partnerships and trade names above described.''

The allegations of fraud appearing in said petition are as follows:

"The said Josiah C. Wolcott had no familiarity with the books of accounts kept by or for said joint adventure, or in which said joint adventurers were interested, and had no knowledge of the extent of the enormous profits that had been made by said joint adventure at the time of the purported sale of his interest in said joint adventure, as hereinafter set forth, and being sick in body and mind, said Josiah C. Wolcott was in no condition to transact business and to inform himself of the true condition of said business and he accepted the statements exhibited to him by the defendants and their attorney, in whom he had confidence respecting said business, and relying upon the assurances of defendants and of their said attorney and believing their representations and statements to be true, the said Wolcott on or about the first day of March, 1916, sold and transferred to said J. D. Guyton his interest in said joint adventure and in the corporations above mentioned upon the basis of one-sixth interest to said Wolcott in the net profits of said joint adventure, which were according to the statements and representations of said defendants approximately $2,000,000; that the interest of said Wolcott in said profits as shown by said statement was approximately $340,000, and defendants thereupon paid to said Wolcott in full settlement of his interest in said profits the sum of $195,000, the difference between the interest of said Wolcott in said profits and the amount which said statements and representations showed said Wolcott had drawn which had reached the total sum of approximately $145,000.

"Said statements exhibited to said Wolcott and the representations made by defendants and by their attorney were false and were known at the time to be false and were made for the purpose of cheating and defrauding said Wolcott and taking advantage of his illness and helpless condition; that the total profits of said joint adventure which were subject to division at that time were in excess of $5,000,000 instead of $2,000,000, as fraudulently represented by defendants; that said purported sale of the interest of said Wolcott thus fraudulently obtained was for the real benefit of said Guyton, Harrington and Beers, all of whom participated in said fraudulent scheme and all of whom shared in the profits thereof.

"Plaintiff further states that in anticipation of their scheme to cheat and defraud the said Wolcott and in furtherance thereof the said defendants withdrew from the assets of said Stock Yards Horse and Mule Company money and other property of a total value in excess of $800,000 and fraudulently concealed said money and property and caused the books of said company to be kept in a manner to conceal said assets and to conceal the fact that they had been thus wrongfully and fraudulently diverted so that the books

of said company did not reflect nor reveal the true condition of said company, nor the true amount of the profits thereof, but falsel- showed that the profits of said business on the said 29th day of February, 1916, were more than $800,000 less than the true profits of said company, which at that time were in excess of $3,000,000. And further in carrying out said fraudulent scheme, the said defendants concealed the profits earned by the said Womack and Stroud Mule Company which at the time of said pretended sale exceeded $200,000 and withheld from said Wolcott all information concerning the operation of said company and caused said company to be dissolved and its books to be destroyed so that at the time of said pretended sale, the said Wolcott, relying upon the said defendant- and having no knowledge of their fraudulent concealment, believed that the profits which had accrued to said joint adventure through the operations of said Womack and Stroud Mule Company had been included in the profits realized by said joint adventure. And further in carrying out said fraudulent scheme, the said defendants fraudulently concealed and withheld from said Wolcott all knowledge concerning the business transacted through the partnership known as Biddle and Company and caused the books of said Biddle and Company to be destroyed, and the said Wolcott relying upon said defendants, believed that the profits realized through said partnership had been included in the represented total profits of the joint adventure.

"And further in carrying out said fraudulent scheme the defendants fraudulently withdrew or caused to be withdrawn from the treasury of the Stock Yards Horse and Mule Company for the alleged use and benefit of the C. & A. Horse Company, more than $250,000, and fraudulently withheld until after the said 29th day of February, 1916, to-wit, May, 1916, profits which had accrued to and been received by said Guyton from said C. & A. Horse Company and which should have been paid into the treasury of said Stock Yards Horse and Mule Company; that the amount of said profits so received by said Guyton and wrongfully withheld by defendants and concealed from the said Wolcott was in excess of $163,000.

"And further in carrying out said fraudulent scheme the said defendants fraudulently concealed from said Wolcott the profits which had been earned and received from the feeding of horses and mules for the British Government by the Guyton and Harrington Mule Company, which said profits which had accrued on the said 29th day of February, 1916, were in excess of $1,000,000."

The petition further alleged that information that he had been thus defrauded by defendants first came to said Wolcott about July, 1921, "and that immediately following the reception of said information, the said Wolcott began and continued investigations to verify the

same and to ascertain and determine his rights in the premises; that by reason of the fraud and deceit so practiced upon him, upon which the said Wolcott relied, he was entitled and plaintiff is entitled to have said purported sale of his interest in said joint adventure cancelled and set aside and to be restored to all of the rights and profits in and to said joint adventure, which the said Wolcott would have enjoyed had said purported sale not been made, and plaintiff is entitled to have an accounting taken between him and the defendants of the profits of said joint adventure, and to have judgment against defendants for such sum as would be shown by such accounting to be lawfully due plaintiff; that plaintiff has no adequate remedy at law.''

The prayer of the petition is ''that the purported sale made by said Wolcott on March 1st, 1916, as aforesaid, be set aside and for naught held; that an accounting be taken between plaintiff and defendants, and that the plaintiff have judgment for such sum as may be found lawfully due upon such accounting, and that plaintiff may have such other and further relief as to the court may seem just and proper, the premises considered.''

Defendants' answer verified by J. D. Guyton contains a general denial, a plea of the Statute of Limitation, particularly Section 1317, Revised Statutes 1919, and a special denial ''that shortly after the beginning of the Great War, to-wit, on or about September 1, 1914, or at any other time, these defendants and plaintiff's decedent or any of them engaged together under an oral agreement as joint adventurers in the business of buying and selling and generally dealing in horses and mules throughout the United States and in foreign countries and agreed that said joint adventure should include all the business thereafter transacted by these defendants and plaintiff's decedent and the corporations, partnerships and trade names mentioned and described in plaintiff's petition and any other corporations or partnerships which these defendants and plaintiff's decedent might thereafter form, and that the profits realized to these defendants and plaintiff's decedent from the operation of all such corporations, partnerships and trade names should be pooled and divided among the said joint adventurers on the basis of a division of the stock of the Stock Yards Horse & Mule Company, to-wit: one-fourth to each the said J. D. Guyton and W. R. Harrington, and one-sixth each to the said H. M. Beers, J. M. Grant and Josiah C. Wolcott, and allege that each and every such averment in plaintiff's amended petition contained is wholly false and untrue.''

Plaintiff's reply was a general denial.

Respondents first strenuously insist that plaintiff's amended petition, upon which the case was tried, fails to state a cause of action. If such a defect exists it is jurisdictional in its nature and ''is due

1048

to be raised in any court or at any stage of the case." [Chandler v. Railroad, 251 Mo. 592, 599, 158 S. W. 35.] Counsel for respondents thus broadly state their position on the point so raised: "Plaintiff's petition fails to state facts sufficient to constitute a cause of action in that the alleged oral agreement of joint adventure is illegal and void, even if entered into, because contrary to public policy and the laws of our State."

Regarding the power of courts to declare contracts void as against public policy, this court, upon an exhaustive review of authorities, said in the case of In re Estate of. Rahn, 316 Mo. 492, 501, 291 S. W. 120, 51 A. L. R. 877:

"It seems clear to us, therefore, from the great weight of judicial authority, that no act or transaction should be held to be void as against public policy unless it contravenes some positive, well-defined expression of the settled will of the people of the State or Nation, as an organized body politic, which expression must be looked for and found in the Constitution, statutes, or judicial decisions of the State or Nation, and not in the varying personal opinions and whims of judges or courts, charged with the interpretation and declaration of the established law, as to what they, themselves, believe to be the demands or interests of the public. So it necessarily follows that courts should exercise extreme caution in declaring any act or transaction void as against public policy, unless it clearly appears that the transaction contravenes the Constitution, some positive statute, or some well-established rule of law announced by the judicial decisions, of the State or Nation."

The matters pleaded by way of inducement and averments of substantive facts relative to the agreement set forth in plaintiff's amended petition may be summarized as follows. (a) Prior to September 1, 1914, Guyton, Harrington, Wolcott, Beers and Grant had been extensively engaged in the business of buying and selling horses and mules and had large stations and plants at various places, which stations and business enterprises were being conducted in the names of three different Missouri corporations, the stockholders, directors and officers of which consisted in a large part of the same persons, and the entire capital stock of one corporation being owned by said Guyton and Harrington and the entire capital stock of the other two corporations being owned by said Guyton, Harrington, Wolcott, Beers and Grant. (b) After September 1, 1914, the said Guyton, Harrington, Wolcott, Beers and Grant formed other corporations, partnerships and trade names for the more convenient handling of said business. (c) Shortly after the beginning of the World War large purchases of horses and mules were made by the British Government with the said Guyton under an arrangement

entered into by the said Guyton and Beers pursuant to an understanding and arrangement between the said Guyton, Harrington, Wolcott, Beers and Grant. (d) In view of the "enormous increase in their business, resulting from said purchases, and in contemplation of a further enormous increase in the purchase of horses and mules by the British Government and other belligerent allied powers, which were then engaged in the War or which might afterwards come into the War as allied or associated powers, and for the more convenient and adequate financing of said enterprises, which required an enormous amount of borrowed capital, exceeding the borrowing capacity of the said Guyton, Harrington and Beers, and for the more convenient and simple handling of said business, and the division of the profits thereof, and for the more effective concentration and employment of all the resources of all the parties and corporations which they owned and to enable the said parties to form, use and employ other corporations, partnerships and trade names in adequately meeting the demands of such enormously expanded business, the said Guyton, Harrington, Wolcott, Beers and Grant engaged together under an oral agreement as joint adventurers in the business of buying and selling, and generally dealing in horses and mules throughout the United States and in foreign countries, and agreed that the said joint adventure should include all of the business thereafter transacted by the said mentioned individuals, corporations, partnerships, trade names, and any other corporations or partnerships thereafter formed by said parties, and that the profits realized to said parties from the operation of all such corporations, partnerships and trade names should be pooled and divided among the said joint adventurers on the basis of a division to the then stock ownership of each of said parties in the capital stock of the Stock Yards Horse and Mule Company," and "it was further agreed that said joint adventure should continue as long as said corporations, partnerships or trade organizations, or any of them would be engaged in the business of supplying horses and mules to the British Government or to any of the allied or associated powers engaged in the War."

Respondents' attack on the amended petition is more or less interspersed with statements of their interpretation of the evidence. In dealing with the sufficiency of the petition to state a cause of action such references will not, of course, be considered. Also, on account of distinctions hereafter noted we do not concede the accuracy of respondents' accompanying assertions that "joint adventure is but a new name for partnership," and that "a petition which fails to state facts sufficient to charge a partnership also fails to state facts sufficient to charge a joint adventure relation." Moreover, some questions raised and discussed at length by respondents under

this head must be disregarded because not within the facts pleaded. For instance, it is unnecessary for us to consider whether or not a corporation can enter into either a partnership agreement or one of joint adventure, because the agreement is alleged to have been entered into by no one except the five named individuals, to-wit, Guyton, Harrington, Wolcott, Beers and Grant. Again, the power of a bare majority of the shareholders of a corporation, in the absence of corporate action, to yield control of its business under an agreement with non-shareholders is an irrelevant question on the sufficiency of the amended· petition because it is alleged that all of the stock of all of said corporations was owned by some or all of said parties to the agreement in question, and no such surrender of control is pleaded.

So respondents' objections on this head, as counsel admit, finally simmer down to the contention that the agreement pleaded is, that the five named joint adventurers, owning all the stock of all the corporations although three of them owned no stock in one of the corporations, should masquerade as shareholders in said corporations, ignore them as corporate entities, and control their corporate property, assets, business and profits as members of and for the sole benefit of said joint adventure, and, therefore violative of the corporation laws of this State. Respondents cite no constitutional or legislative provision of this State as having been thus violated, but rely upon certain judicial decisions, such as Boag v. Thompson, 203 N. Y. Supp. 395; Seitz v. Michel, 148 Minn. 80, 181 N. W. 102, 12 A. L. R. 1060; Sun River Stock & Land Co. v. Montana Trust & Sav. Bank, 262 Pac. 1039; Pullman Palace Car Co. v. Mo. Pac. Ry. Co., 115 U. S. 587; and particularly, Jackson v. Hooper, 76 N. J. Eq. 592, 598, 599, 75 Atl. 568, 27 L. R. A. (N. S.) 658.

In the latter case the bill and injunction rested upon the theory that complainant who had united with one of the defendants in acquiring in equal shares all of the stock of two foreign corporations, under an agreement claimed to have created a partnership or joint adventure, was entitled to treat the two corporations as mere agencies or instrumentalities in the conduct of the joint business, subjecting not only the stock owned by both parties but all the corporate property to the control of a court of chancery according to the principles of the law governing the alleged agreement. The court held that even assuming that complainant had established the agreement alleged, it was without power to enforce it, substantially for reasons stated as follows:

"It is claimed, however, that these owners of all the stock were really copartners, doing business in corporate form for their own convenience, and that a court of equity has the power to control the property and affairs of the companies even to the extent of eliminating the corporate functions and powers as mere incidents and wholly

disregarding the substantive law governing the creation, supervision and dissolution of corporations. We cannot subscribe to any such doctrine.

"An agreement or course of dealing by which corporations are organized for the purpose of using them merely as agencies or instrumentalities, or forms in the conduct of a copartnership or joint business, and by the consent of the parties in interest to be independent of statutory control, cannot be recognized, enforced or perpetuated by the court of chancery in this State.

"It is fundamental that, no matter how the shares of stock are held, the corporation itself is an entity wholly separate and distinct from the individuals who compose and control it.

"The complainant and the defendant, though owning the entire capital stock of the two corporations, are not, as expressed by Chief-Justice WAITE in the leading case of Pullman Palace Car Co. v. Missouri Pacific Railway Co., 115 U. S. 587, 'the corporation, in the sense of that term as applied to the management of the corporate business or the control of the corporate property.'

"The law never contemplated that persons engaged in business as partners may incorporate, with intent to obtain the advantages and immunities of a corporate form and then, Proteus-like, become at will a copartnership or a corporation, as the exigencies or purposes of their joint enterprise may from time to time require.

"The policy of the law is to the contrary. · If the parties have the rights of partners they have the duties and liabilities imposed by law and are responsible *in solido* to all creditors.

"If they adopt the corporate form, with the corporate shield extended over them to protect them against personal liability, they cease to be partners and have only the rights, duties and obligations of stockholders. They cannot be partners *inter sese* and a corporation as to the rest of the world.

"Furthermore, upon grounds of public policy, the doctrine contended for cannot be tolerated, as it renders nugatory and void the authority of the legislature—a co-ordinate branch of the government—established by the constitution in respect to the creation, supervision and winding up of corporations."

We deem it unnecessary to rule upon the applicability of the doctrine above stated to a similar state of facts under the corporation laws of this State, because it appears that the agreement pleaded in plaintiff's amended petition is not susceptible of the construction respondents seek to place upon it. As said in 21 Ruling Case Law, pages 464, 466:

"A rational construction is to be given to pleading where it is susceptible of it; that is, it should be construed according to its general scope and tenor, as appears from the averments, and where

it is open to construction, that reasonable meaning which will support it should be adopted rather than one which will defeat it. . . .

"Under the code, pleadings are to be liberally construed, and the common-law rule that they are to be construed most strongly against the pleader is not applicable, the code rule being, in a measure, an approximation to the general rule in equity. Contrary to the common-law rule, every reasonable intendment and presumption under the rule of liberal construction must be made in favor of the pleader; and the pleading must be fatally defective before it will be rejected as insufficient, it being the controlling purpose under the operation of this rule to try all questions on their merits, with a view to substantial justice between the parties."

Applying the above standard of construction to the pleading in question, we do not think it can be fairly said that the agreement that "the said joint adventure should include all of the business thereafter transacted by the said mentioned individuals, corporations, partnerships, trade names, and any other corporations or partnerships thereafter formed by said parties" was an agreement that any of the entities mentioned would not be permitted to control its own property, assets, business and profits as such in the manner prescribed by law. The very language of the pleading clearly implies that the business of each entity should be *transacted by it*. Such an agreement is neither illegal nor self-contradictory. The business of the joint adventure was the special undertaking of furnishing horses and mules to the British Government and allied powers during the World War. It is alleged that this business was obtained by the concerted action of the said Guyton, Harrington, Wolcott, Beers and Grant pursuant to an understanding and agreement between them. A reasonable inference from the pleading is that they were all interested in and controlled this business with full power to allocate its transaction in any manner not unlawful.

In Sun River Stock & Land Co. v. Montana Trust & Sav. Bank, 262 Pac. 1039, 1045, cited by respondents, the court said: "We do not overlook the fact that a partnership, in carrying on its activities, may cause corporations to be formed for the operation of portions of its business and that the partnership, or the partners, may own all of the corporate stock."

Any agreement among partners or joint adventurers to adopt such a course would not be against public policy unless plainly in contravention of some provision of the constitution, some positive statute, or some well established rule of law announced by the judicial decisions of the state or nation. While, in this instance, the transaction of any allotted portion of the business by a particular entity became the business of that entity, yet because its transaction aided in the consummation of the general undertaking of the joint

adventure it could properly be said to be included in the business of the joint adventure. Any losses that might overtake any of these separate entities in such transactions would necessarily be borne eventually by the shareholders or those participating therein, here alleged to be none other than the joint adventurers. This contingency, together with the contribution of their combined individual resources and skill pleaded as necessary to consummate the main undertaking, whether made to these entities, corporate or not, or directly to the joint adventure, would stamp an agreement between the alleged joint adventurers to share in the profits realized by them from such entities as fair and equitable. Certainly the agreement that "the profits realized to said parties from the operation of all such corporations, partnerships and trade names should be pooled and divided among the said joint adventurers," did not contemplate any unlawful interference with the right of the corporations to declare dividends, because no profits could be realized to said parties, shareholders in said corporations, until such profits were lawfully distributed. The pleading as a whole contains no suggestion of an agreement or intention of the joint adventurers to mask their identity as such by ownership of the stock of these corporations, or to conduct them "independent of statutory control," ignore them as corporate entities, or control them in any unlawful manner. This interpretation, which we feel constrained to place upon plaintiff's amended petition, renders inapplicable the doctrine stated in the Hooper case, supra, and in other similar cases cited by respondents.

Counsel for respondents also say that the agreement pleaded is neither a joint adventure nor a partnership. As respects the character of the business undertaken, the principal difference between a partnership and a joint adventure is said to be that (33 C. J. 842) "while a copartnership is ordinarily formed for the transaction of a general business of a particular kind, a joint adventure is usually, but not necessarily, limited to a single transaction, although the business of conducting it to a successful termination may continue for a number of years." As already observed, the undertaking pleaded was of a limited or special nature, to-wit, the furnishing of horses and mules for the British Government and allied powers during the continuation of the World War. This justifies the conclusion that the agreement pleaded is not one of copartnership. Is it then an agreement of joint adventure?

In 33 Corpus Juris, page 841, it is said that a joint adventure as a legal concept is of comparative recent origin and purely the creature of American courts. About the middle of the last century our courts began to find it convenient to draw a distinction between partnerships and joint adventures, and they are gradually building

up a body of American law applicable to the relation of joint adventures which may or may not apply to the law of partners. A joint adventure has been aptly defined in Schouler Pers. Prop. (5 Ed.) sec. 167a, as a "special combination of two or more persons, where in some specific venture a profit is jointly sought without any actual partnership or corporate designation." As to creation and existence of the relation, it is said in 33 Corpus Juris, 845 that "whether the parties to a particular contract have thereby created, as between themselves, the relation of joint adventurers, . . . depends upon their actual intention, which is to be determined in accordance with the ordinary rules governing the interpretation and construction of contracts." Also (p. 847), "The fact that the contract provides for a sharing of the profits, while an important factor in determining the character of the contract, does not of itself make it one of joint adventure. There must be something more, some active participation in the enterprise; some control over the subject-matter thereof or property engaged therein. ' . . . Any person legally competent to contract may become a party to a joint adventure. . . . To constitute such a contract no particular form of expression or formality of execution is necessary. It need not be express, but may be implied in whole or in part from the conduct of the parties." Further (p. 848), "In the absence of statutory provisions to the contrary the contract may be oral or written. . . . The usual rules as to the construction and operation of contracts, generally, apply to this kind of contract. If a joint adventure is proved, either by direct evidence of a mutual agreement to that end or by proofs of facts and circumstances from which it is made to appear that such enterprise was in fact entered into, the law fixes the rights of the parties. · . . . The agreement is not rendered invalid by any uncertainty in the duration of the business or indefiniteness in the minor details of the adventure. . . . The mutual promises of the parties to a joint adventure are a sufficient consideration to support their contract. If it is supported by several promises, the fact that one of them becomes unenforceable will not destroy the validity of the contract; nor will a defect in the title to some of the personal property contributed by one of the parties have that effect." Also (pp. 851-2), "Within the scope of the enterprise they stand in a fiduciary relation each to the other, and are bound by the same standards of good conduct and square dealing as are required between partners." As to illegality of enterprise (p. 862); "If the contract for the joint adventure is prima-facie valid, it is no defense to an action for an accounting to say that it was for an illegal purpose, or was performed by defendant in an illegal manner, or that he was guilty of illegal acts or fraud in the execution of it, or that the rights acquired thereunder were ob-

tained in an illegal or immoral way. Even though the contract is against public policy, if it is closed, the party receiving the profits must account to his associates for their shares thereof." With respect to sharing losses (p. 865): "In the absence of an express limitation in the agreement between them, every party to a joint adventure is bound by the nature of his relation to his associates to share with them the losses sustained in the enterprise, and this duty may be enforced either by an action to compel contribution, or by taking the item into an accounting and deducting the loss from the profits to be distributed. . . . Unless the agreement fixes a different ratio, the members will be presumed to have intended to share the losses between or amongst them in the same proportions as they share the profits." Suits in equity between members (p. 867): "The fiduciary relation existing between members of a joint adventure confers upon courts of equity jurisdiction to hear and determine all controversies arising between them, and this jurisdiction will be exercised, even though complainant may have a remedy at law for the redress of his grievance; and especially is this true when the controversy is of a complex character. . . . A suit in equity seeking the rescission of a contract for fraud or to compel an accounting for profits will not be barred by laches. if complainant did not know the facts entitling him to relief until a short time before the commencement of the action, or if his delay in bringing it was caused by defendant's conduct and statements which inspired complainant to believe that an amicable settlement might be effected, or if defendant's fraud and concealment prevented complainant from proffering his contribution to the purchase of property in which he had a right to participate."

There is an abundance of case law on the subject. A joint adventure has been defined as an association of two or more persons to carry out a single business enterprise for profit, for which purpose they combine their property, money, effects, skill, and knowledge. [Forman v. Lumm, 212 N. Y. Supp. 487; Fletcher v. Fletcher, 206 Mich. 153; Donahue v. Haskamp (Wash.), 187 Pac. 346; Alderton v. Williams, 139 Mich. 296; Wilson v. Maryland, 152 Minn. 506; McKeel v. Mercer, 118 Okla. 66; Perry v. Morrison, 118 Okla. 212; Dexter & Carpenter v. Houston, 20 Fed. (2d) 647; Hey v. Duncan, 13 Fed. (2d) 794, 795.] It can arise only by contract or agreement between the parties. [Tusant & Son Co. v. Weitz Sons, 195 Iowa, 1386, 1396; National Surety Co. v. Winslow, 143 Minn. 66; Arnold v. De Booy. 161 Minn. 255, 39 A. L. R. 403; Sommerfield v. Flury (Wis.). 223 N. W. 408.] But joint adventure may be established without any specific formal agreement to enter into a joint enterprise; it may be implied or proven by facts and circumstances showing such enterprise was in

fact entered into. [In re Taub, 4 Fed. (2d) 993; Goss v. Lanin, 170 Iowa, 57; Nelson v. Lindsey, 179 Iowa, 862; O. K. Boiler & Welding Co. v. Minnetonka Lbr. Co., 103 Okla. 226.] There must be some active participation in the enterprise, some control over the subject-matter thereof or property engaged therein. [Darling v. Buddy, 318 Mo. 784, 58 A. L. R. 493, 1 S. W. (2d) 163; Atlas Realty Co. v. Galt, 153 Md. 586.] But it may be said of the great majority of such agreements that they do not point out precisely what each party is to do under them. [Anderson v. Blair, 202 Ala. 209.] And the contract is not avoided for indefiniteness because the minor details are not fully established. [Dolan v. Dolan, 107 Conn. 342, 349.] Ward v. Thompson, 22 How. 330; Meehan v. Valentine, 145 U. S. 611, and cases cited on page 1059, 48 A. L. R., hold that a specific agreement to share losses is not necessary in either a partnership or a joint adventure. Such an agreement may be implied. [Simpson v. Richmond Worsted Spinning Co. (Me.), 145 Atl. 250; Beatty v. Ammidon, 260 Mass. 566.] Decisions defining and describing partnerships are not controlling upon the question of whether the parties to the agreement were joint adventurers. [Elliott v. Murphy Timber Co., 48 A. L. R. 1043, 1047, 117 Ore. 387.] But rights as between the adventurers are governed by the same rules that govern partnerships. [Boles v. Akers, 116 Okla. 266; Church v. Odell, 100 Minn. 98; Goodwin v. Camp, 295 Fed. 785 791; Keyes v. Nims, 43 Cal. App. 1.] Such a contract can be made by competent parties, individuals, and firms, and a corporation may bind itself by a contract for a joint adventure the purposes of which are within its corporate powers. [Tusant & Son Co. v. Weitz Sons, 195 Iowa, 1386, 1397; Rowley on Partnership, vol. 1, sec. 160; Fletcher Cyc. Corporations, vol. 2, p. 1802.]

It seems clear that the agreement pleaded is one of joint adventure, and with the above general observations concerning the law of such agreements we pass to a consideration of the sufficiency of the evidence to prove joint adventure and fraud, questions which were ruled against plaintiff by the successor judge in sustaining defendants' motion for a new trial. A brief recital of some of the pertinent and practically undisputed evidence will pave the way to a better understanding of these issues.

About 1898 J. D. Guyton and W. R. Harrington, then engaged in the horse-and-mule business in St. Louis, formed a Missouri corporation known as the Guyton and Harrington Mule Company. At the beginning of the World War in August, 1914, it was capitalized for $300,000, all of the stock being then owned by said Guyton and Harrington equally, except 100 shares of the par value of $10,000 which belonged to J. Frank Guyton, son of J. D. Guyton.

A year or so later J. D. Guyton and W. R. Harrington, being desirous of establishing a business in Kansas City, organized the Stock Yards Horse & Mule Company, a Missouri corporation, at first capitalized for $60,000 and soon thereafter increased to $100,000 when Josiah C. Wolcott, H. M. Beers and J. M. Grant, who had previously been independent dealers in horses and mules under the name of Wolcott, Beers and Grant, acquired stock, and at the beginning of the World War and for some time prior thereto the ownership of the stock of that corporation was 504 shares equally divided between said Guyton and Harrington and 496 shares equally divided between Wolcott, Beers and Grant. It also did business under the trade name of Wolcott, Beers and Grant and is frequently so referred to in this case.

During the Boer War, in 1901 and 1902, J. D. Guyton or Guyton & Harrington Mule Company furnished nearly sixty thousand horses and almost as many mules to the British Government. The business of furnishing horses was allocated to the Stock Yards Horse & Mule Company and the profits therefrom were ultimately realized by the said Guyton, Harrington, Wolcott, Beers and Grant on the basis and through their holdings of stock in this corporation. The business of furnishing the mules, however, was distributed among various mule dealers at Kansas City, including Wolcott and Beers, deliveries to and payments by the British Government being made through J. D. Guyton or the Guyton & Harrington Mule Company, and the profits therefrom were realized to said dealers on the basis and through the form of a temporary purchase of stock in the Guyton & Harrington Mule Company in proportion to the profits agreed to be realized in this particular venture by each.

Thereafter, and years before the World War, a Missouri corporation, known as Wolcott, Beers and Grant Horse and Mule Company was organized with capital stock of $100,000, 50 per cent of the stock of which was owned by J. Frank Guyton and W. K. Harrington, sons of J. D. Guyton and W. R. Harrington, respectively, and 50 per cent owned equally by Wolcott, Beers and Grant. This corporation was engaged in the horse-and-mule business in East St. Louis, Illinois, for several years, but had discontinued business, though not dissolved, when the World War began, and was largely indebted to the Stock Yards Horse & Mule Company. However, it owned spacious barns and yards in East St. Louis, some of which were rented to the Guyton & Harrington Mule Company.

The Womack and Nicoll Mule Company was another Missouri corporation organized some years before the beginning of the World War, one-half of the stock being owned equally by J. D. Guyton and W. R. Harrington and one-half equally by said Wolcott, Beers and Grant. During the World War this corporation was reorganized

as the Womack and Stroud Mule Company with the same ownership of stock.

On August 16, 1915, a partnership known as the C. & A. Horse Company was formed by John S. Tough, J. F. Reid, J. W. Howard and J. D. Guyton, for the purpose of furnishing horses to the British Government, each of these parties being connected with a firm or corporation dealing in horses, it being agreed that each member of the partnership should share equally in the profits and losses of the business. This partnership continued for ninety days. On July 1, 1916, a similar partnership was formed by J. D. Guyton, J. F. Reid and J. W. Howard known as the C. & A. Horse and Mule Company, for the purpose of furnishing horses to the British Government and horses and mules to the United States Government, it being agreed that the said Guyton should receive one-half of the profits realized from the sale of horses to both governments and three-fourths of the profits realized from the sale of mules to the United States Government, the said Reid and Howard to share equally in the remaining profits, the said Reid and Howard to bear the expenses and losses incurred by them and the said Guyton to bear the expenses and losses incurred by him in the transaction of said business. Under date of November 21, 1916, the Guyton & Harrington Mule Company and the Stock Yards Horse & Mule Company agreed in writing that all profits from sales of horses by Guyton & Harrington Mule Company and by J. D. Guyton, including the share of the profits of J. D. Guyton in the C. & A. Horse Company, to whomsoever made from the beginning of the World War until the expiration of the lease given by the State Line Improvement Company and held by the Stock Yards Horse & Mule Company, should belong to the latter company, which should bear all expenses and losses incurred in the business.

Commencing August 4, 1915, J. M. Biddle, merely as an employee of the Stock Yards Horse & Mule Company and financed by that corporation, dealt in and furnished mules under the trade name of J. M. Biddle and Company.

A symbol account, appearing as C. & A. Company, was carried on the books of the Stock Yards Horse & Mule Company long prior to and during the World War and is said to have been kept as a mere matter of convenience in accounting, the letters C. and A. signifying "Cavalry" and "Artillery" horses, to show the profits and losses of the Stock Yards Horse & Mule Company in government transactions.

In the month of August, 1914, and shortly after the commencement of the World War, J. D. Guyton, Josiah C. Wolcott, H. M. Beers and J. M. Grant conferred with each other with a view to securing the business of furnishing horses and possibly mules to the British

Government. Thereupon the said Guyton and Beers proceeded to Toronto, Canada, their visit resulting in orders for horses from Major-General Sir Frederick Benson, representing the British Remount Commission. These animals were furnished by the Stock Yards Horse & Mule Company and inspected by British officers at its barns in Kansas City. When the first order was received the same parties again conferred regarding the method they should follow in handling and financing the business. The testimony is conflicting as to whether or not W. R. Harrington attended this conference, but it is admitted that shortly thereafter he went to Chalmette, Louisiana, not far from New Orleans, and commenced providing immense facilities for the reception and embarkation of mules upon ocean vessels. J. D. Guyton again met General Benson in Toronto about October 17, 1914, and procured specifications and orders for mules from the British Government, and arranged for inspection at Kansas City by Major-General Charles H. Bridge, who was placed in charge of the British Remount Mule Commission in the United States. From that time large orders for both horses and mules were placed in rapid succession by the British Government with the Guyton & Harrington Mule Company, and until April or May, 1915, all such animals accepted from the Kansas City territory were furnished by the Stock Yards Horse & Mule Company and inspected in its barns at that place, although the deliveries to and payments by the British Government were made through the Guyton & Harrington Mule Company, which owned or controlled large pastures, barns, feeding stations and loading facilities at Lathrop, Missouri, as well as yardage, shelter and facilities at the embarkation point of Chalmette, Louisiana, and other places. During the same period mules were furnished by the Guyton & Harrington Mule Company at East St. Louis, and by the Womack & Nicoll Mule Company at Nashville and Columbia, Tennessee, and other points, largely with funds advanced by the Guyton & Harrington Mule Company.

About the middle of April, 1915, W. R. Harrington returned from Chalmette to Kansas City and took charge of the mule department of the Stock Yards Horse & Mule Company there. On April 17, 1915, Wolcott went to Denver, Colorado, to buy horses, and later Grant went to Fort Worth, Texas, to buy mules. Shortly after Harrington's arrival in Kansas City the mule inspection was transferred to Lathrop. On July 3, 1915, J. D. Guyton, W. R. Harrington, Wolcott, Beers, Grant and F. F. Rozzelle, attorney for the above mentioned corporations, held a meeting at Lathrop. Immediately thereafter Wolcott and Grant, both of whom were in failing health, proceeded to California, and for several months the latter

was engaged with other representatives of the Stock Yards Horse & Mule Company in the purchase of horses and mules at Sacramento.

In the fall of 1915 Wolcott suffered a stroke of apoplexy and was brought to his home in Kansas City on a stretcher. During the succeeding months he recovered to the extent that he was able to make occasional trips down town. In the meanwhile the stations at Denver and California were closed, and Grant returned to Kansas City suffering severely from diabetes, on account of which ailment he was thereafter more or less disabled until his death, which occurred before this suit was tried.

During that fall and winter Rozzelle and Wolcott had several conferences which culminated in a written contract for the sale of Wolcott's interest in the horse and mule business to J. D. Guyton, dated March 1, 1916, for a recited cash consideration of $195,380.38 and Guyton's agreement to hold Wolcott harmless from any and all indebtedness or moneys charged against him on the books of the Stock Yards Horse & Mule Company, Womack & Stroud Mule Company and Wolcott, Beers & Grant Horse and Mule Company. A few days later Grant entered into a similar contract with J. D. Guyton for the purchase of all of Grant's interests in the horse-and-mule business except that the cash consideration recited was $261,386.17. Other evidence showed that the total consideration under these contracts was $340,000 and $350,000, respectively.

Thereafter, on November 21, 1916, a written agreement was entered into between the Guyton & Harrington Mule Company and H. M. Beers providing that the latter should receive one-eighth of the net profits of said corporation made from the beginning to the end of the World War from "all sales of horses and mules including cotton mules at all locations," and from "the feeding and care of horses and mules at all locations," with certain specified exceptions as to the latter.

On March 31, 1917, a written agreement supplemental to the above was entered into between Guyton & Harrington Mule Company and H. M. Beers providing that in addition to the profits to be received by the said Beers under said primary agreement he should "receive one-eighth of the net profits from feeding and care of horses and mules by said company at and near Lathrop, Missouri, from March 1, 1917, to the termination of said primary contract."

By written agreement dated February 6, 1917, between W. R. Harrington and J. D. Guyton the former obtained from the latter three-eighths of the interest which the latter had previously acquired by written agreements above noted from Wolcott and Grant.

Under date of February 12, 1918, J. D. Guyton, W. R. Harrington and H. M. Beers entered into a written agreement reciting

that the said Harrington had acquired the three-eighths interest above noted from the said Guyton, and that the said Beers had acquired a one-fourth interest in the interests previously purchased by said Guyton from Wolcott and Grant, and providing that the said Beers and Harrington should hold the said Guyton harmless, to the extent of their respective interests so purchased from him, on account of Guyton's said contracts with the said Wolcott and Grant.

The records of the Stock Yards Horse & Mule Company show that at a directors' meeting of said corporation held May 28, 1917, surplus profits to amount of $1,845,779.48 were reported earned prior to July 1, 1915, surplus profits to amount of $368,558.05 were reported earned from July 1, 1915, to June 30, 1916, and both sums were ordered to be distributed as dividends to J. F. Guyton, W. K. Harrington, J. D. Guyton, W. R. Harrington and H. M. Beers, and to various other persons to whom the three persons last named had caused stock to be transferred in April and May, 1917. The records of the same corporation show that on June 30, 1917, another directors' meeting was held and it was there shown that in addition to $100,000 of fully paid capital said corporation had a reserve fund of $84,796.23, and surplus profits earned since June 30, 1916, in the sum of $677,265.35. All of these funds were also ordered to be distributed to the stockholders. The total amount thus shown by the records to have been set aside at these meetings for distribution is $3,076,399.11. At a subsequent meeting of the stockholders held July 14, 1917, the corporation was dissolved.

The records of Guyton & Harrington Mule Company show that at a meeting of the board of directors of said corporation held on May 14, 1917, all of the directors, to-wit, J. D. Guyton, W. R. Harrington, and J. F. Guyton, being present, a statement was presented prepared from the corporation's books of account showing net profits earned during the years 1914, 1915 and 1916, as follows:

| | Chalmette and Lathrop feeding. | Sales and all other feeding. |
|---|---|---|
| 1914 and 1915 | $474,507.09 | $1,204,516.64 |
| 1916 | 539,890.08 | 673,459.16 |

On motion of Mr. Harrington, duly seconded, the following resolution was unanimously adopted:

"Resolved, That a dividend be and hereby is declared, out of surplus profits earned during the years 1914 and 1915, in the amount of $1,679,023.73; and that a dividend be and hereby is declared out of surplus profits earned during the year 1916, in the amount of $1,213,349.24; and that the secretary of this meeting be directed to instruct the bookkeeper to transfer from the Surplus account

on the Company's books, to a Dividend account, the two amounts mentioned herein; and credit the individual accounts of the stockholders of said Company with the following amounts respectively:

|  | 1914 and 1915 | 1916 |
|---|---|---|
| J. D. Guyton | $197,425.99 | $145,850.71 |
| J. F. Guyton | 197,425.97 | 145,850.72 |
| Mrs. May Alice Guyton | 197,425.97 | 145,850.72 |
| Mrs. Fannie May Carkener | 197,425.97 | 145,850.72 |
| W. R. Harrington | 246,251.75 | 181,921.32 |
| W. K. Harrington | 246,251.75 | 181,921.33 |
| Mrs. Martha V. Harrington | 246,251.75 | 181,921.33 |
| II. M. Beers | 150,564.58 | 84,182.39 |

and that the officers of the Company pay to each of said stockholders the amounts set opposite their respective names.''

The Guyton & Harrington Mule Company and associated corporations above mentioned were dissolved and the dividends, capital stock and surplus distributed among the then shareholders in 1917 or 1918.

Some idea of the huge volume of business transacted by the above mentioned corporations, partnerships and trade names may be formed from the figures taken by accountant Loucks from books of Guyton & Harrington Mule Company and Stock Yards Horse & Mule Company, and submitted in the form of exhibits showing that between September 1, 1914, and June 30, 1917, a grand total of 155,512 horses were furnished the British Government, for which it paid the sum of $29,647,167, and between September 1, 1914, and February 21, 1918, a grand total of 240,758 mules, including 1115 mules and 86 jacks shipped to India for which the sum of $210,650 were paid, were furnished the British Government, for which it paid the sum of $43,139,600. Depositions taken in London show that the official records in the British War Office and the India Office are in substantial accord with these figures. It further appears from these depositions that during the years 1914, 1916 and 1917 the British Government paid the sum of $6,501,352.71 for feed supplied, including $35,396.32 for feed for the India shipments, and that all payments for animals and feed were made by the British Remount Commission by checks payable either to Guyton & Harrington Mule Company or to J. D. Guyton.

Coming now to evidence more or less controverted but bearing upon the issues made, we shall first consider the Wolcott testimony directly bearing upon the alleged agreement of joint adventure. It appears in his deposition taken by defendants before a special commissioner about three years before the case came on for trial. It was commenced on October 30, 1922, during Mr. Wolcott's last illness, and finished on November 1, 1922, the day before he died.

In considering the manner in which it was given, his long previous illness and consequently weakened physical condition must be borne in mind. Cross-examined by his own counsel in the presence of opposing counsel, his deposition, as offered and read in evidence directly concerning the alleged agreement, follows with our notation of objections and rulings thereon made at the time the deposition was given and at the trial:

"Q. Now, when did Mr. Guyton or the Guyton-Harrington Mule Company get the first order for horses or mules from the British Government in 1914, about when was it? A. About the first of September.

"Q. Of 1914? A. Yes, sir.

"Q. I will get you to state what occurred then at that time between you and Mr. Guyton, Mr. Harrington, Mr. Beers and Mr. Grant with reference to the handling of this war business and the other business of these allied corporations. A. Well, I don't know as I fully understand what you mean.

"Q. About the time that the European War began and Mr. Guyton secured the first order from the British Government or the first order for the British Government came in for horses and mules, did you and your associates have any conversation and agreement about how that war business and the other business would be handled? A. Yes, sir, we did.

"Q. Where was this conversation? A. In Mr. Guyton's office.

"Q. Here in Kansas City? A. Here in Kansas City.

"Q. And about when was it it occurred? A. Well, just about the first of September, I don't know the exact date.

"Q. And what was the occasion of your having this conference? A. Well, we at the time of the Boer War we let—"

Defendants' objection on ground of irrelevancy, made at the time and renewed at the trial, was overruled.

"A. At the time of the Boer War that business was divided around among all the dealers and they seemed very ungrateful for it. Sparks Bros. shared largely and they closed up and left us and went to St. Louis and I objected, and I think my associates also for letting them share in this British business with and *it was understood that we were to share in all this British business with Mr. Guyton and Mr. Harrington;* Mr. Guyton got the orders for the stock and we were to share as our stock represented in the Stock Yards Horse & Mule Company."

Words which we have italicized were stricken out on defendants' motion, made at the trial, as a conclusion of the witness. Similar motion as to succeeding words overruled.

"Q. In other words, as you have expressed it, was it your agreement there that you would put all of the entire British business into

a jackpot and divide it according to your interests in the Stock Yards Horse & Mule Company?"

Above question was stricken out on defendants' motion, made at the trial, on the ground that it called for a conclusion of the witness. The answer also appears to have been stricken out on motion, but the nature of the answer is not disclosed by the record.

"Q. You were to share in all of the business done by all of the companies? A. Yes, with the British Government."

Question objected to as calling for conclusion and motion made to strike out answer. Both made at the trial and overruled.

"Q. Including the business done by the Guyton-Harrington Mule Company? A. Yes, sir."

Same objection and ruling as above.

"Q. That is the question I am asking. Now, I want you to state, Mr. Wolcott, as nearly as you can, just what was said at that meeting at which you made this agreement among yourselves, not stating in general terms what the understanding was, but state as nearly as you can the conversation? A. Well, I don't know, it has been some time. I don't know as I could state the conversation exactly, but in substance it was this—it was perfectly agreeable to them to do so, we were doing a large business and of course they had the controlling interest in our business, and they were perfectly agreeable to the sharing in it at this time. It only included horses—the first order only for horses but they expected to have large dealings in mules later, and we were in a position to buy the mules and do—"

Defendants' motion, made at the time and renewed at the trial, to strike out the above answer as a conclusion of the witness and not responsive to the question, was sustained.

"THE COMMISSIONER: I wish, Judge Johnson, you would have him detail the conversation of all parties at that time.

"Q. (By MR. JOHNSON): Yes, I wish you would do that. Detail the conversation, that is a very important conversation here. I want to know who made the suggestion in the first place and then what was said by the different ones, as nearly as you can remember? A. I made the proposition myself, and Mr. Beers talked about it and Mr. Grant too.

"Q. What was it you said when you suggested it? A. I suggested that we should have our share of the business ourselves and not give it to outside people, and Mr. Grant and Mr. Beers accorded with me in that.

"Q. They said the same thing? A. Yes, they said the same thing.

"Q. What did Mr. Guyton and Mr. Harrington say? A. Mr. Guyton said that would be all right, he was in accord with it, but

Mr. Harrington objected some, as he always did to anything. He thought that would be giving us too great a share, but we were all at that time rather live members, and Mr. Guyton appreciated that I think, and was willing to concede that we could do more than any other three men interested in the business.

"Q. Well, then, what was the final outcome of the conference there, did they all agree to it? A. Yes, sir."

At the trial defendants objected to this question and answer, assigning no reason, but the objection was sustained. (The trial judge's memorandum opinion shows the following questions and answers without objection at this juncture:

"Q. Including Mr. Harrington? A. Yes, sir.

"THE COMMISSIONER: What did Mr. Harrington say with reference to your proposition? A. He said that seemed to be the sentiment of all and he would abide by it.")

"Q. After that I will get you to state if you continued the business according to that agreement?"

Question objected to as calling for a conclusion. Objection sustained. No answer appears in the record.

"Q. You may state, Mr. Wolcott, after that how the business was handled. this British business of supplying the British Government with horses and mules by the different companies that were included in this agreement or jackpot you talked about? A. Well, we advertised of course very largely and stock was shipped to us in large numbers, they were turned over to us for inspection largely. Of course all the mules that came were turned over to the Guyton-Harrington Mule Company and shipped to Lathrop.

"Q. Who do you mean by 'we'? A. Wolcott, Beers and Grant —The Stock Yards Horse & Mule Company.

"Q. That is the same thing? A. The same thing. The business was principally run in the name of the Stock Yards Horse & Mule Company."

Exceptions were preserved by the respective parties to all of the above rulings. It will be noted that several of these objections were not made until the deposition was offered and read in evidence at the trial. The general rule as to time of objecting to deposition testimony is thus stated in Wigmore on Evidence (2 Ed.), vol. I, p. 177:

"For evidence taken *by deposition before trial*, the general principle is that the objection should be made at the time of the taking (or in general by motion to suppress before trial), if the ground of the objection was such as might have been obviated before trial, but otherwise not. because the officer has ordinarily no power to disallow answers; in other words, the objection before trial serves

as a notice required by fairness to the opponent, rather than as a means of excluding the evidence or obtaining a ruling.''

Also, in Albers Comm. Co. v. Sessel, 193 Ill. 153, 157, quoting Clauser v. Stone, 29 Ill. 114, it is said:

'' 'The general rule is, unquestionably, as stated by the appellee's counsel, that objections on the trial to a paper or other evidence must be specially pointed out, so that they may be obviated, if possible; but this rule applies only to cases where the objection can be removed by evidence, or by the act of the party under the sanction of the court, or by the action of the court itself,'—citing Jackson v. VanShaick, 5 Cow. 123, and Harmon v. Thornton, 2 Scam. 355.''

Wigmore, supra (p. 178), further indicates that the rule is frequently more specifically stated in the form of statutory enactments, as, for instance, that objections to the manner of the interrogatories, as improperly leading the deponent, or to the manner of the answers, as being insufficient and irresponsive, should be made at the time the deposition is taken or, at any rate, before the trial. The reason is that such objections are founded on defects which can be cured, and, hence, unlike objections to the relevancy or competency of evidence. [Weeks on Depositions, secs. 395, 404; Glasgow v. Ridgeley et al., 11 Mo. 35, 40.] Section 1782, Revised Statutes 1929, provides that objections to the competency or credibility of a witness, or the competency or relevancy of any question put to him, or of any answer given by him, may be made at the trial of the cause, though not made when the deposition was taken. Construing this section (then Sec. 2906, R. S. 1899), we said in Williamson v. Brown, 195 Mo. 313, 328, 329, 93 S. W. 791:

"In effect, to this section the maxim, *expressio unius*, has been applied, and it has, accordingly, been ruled that the right given by statute to object at the trial to the competency or relevancy of any question, excluded the right to object to the mere *form* of the question. Objections to form, for obvious reasons, should be made at the time the deposition is taken. [Glasgow v. Ridgeley, 11 Mo. 34.] If so made, they must be renewed at the trial to lay the foundation for a review of rulings *nisi*, thereon. [Kirton v. Bull, 168 Mo. 622.] Hence, we need not consider appellants' objections to certain questions in Hawk's deposition, inasmuch as such objections seek only the form and not the substance of the question and answer.''

Also in Redmond v. Railroad, 225 Mo. 721, 733, 734, 126 S. W. 159:

"An objection to the mere form of a question is waived unless made before the notary at the time it is propounded; in that respect it differs from an objection on the ground of incompetency, for if the testimony drawn out before the notary is incompetent

the objection may be made for the first time when the deposition is offered in evidence.''

In the Williamson case, the Redmond case and Patton v. Ry. Co., 87 Mo. 117, 121, we held that this rule required that objections to questions as leading should be made at the taking of the depositions. Also, in Warlick v. Peterson, 58 Mo. 408, 416, we applied the rule to objection to form of question propounded to a character witness. In Nebraska a statute relating to the taking of depositions provides that ''no exception other than for incompetency or irrelevancy shall be regarded, unless made and filed before the commencement of the trial.'' In Dietrichs v. Railroad Co., 13 Neb. 43, 47, under this statute, it was held that an objection to the genuineness of a letter came late at the trial. The same doctrine is stated in Weeks on Depositions, sec. 404. Also, apropos time for objecting to answer on the ground that it merely states a conclusion, note Woodworth v. Thompson, 44 Neb. 311, 313, 314, as follows:

''The deposition of Thompson was read in evidence. This question was asked, 'You may now state what conversation or conversations you had with the plaintiff concerning the improvements to be made on the hotel property, and when and where the conversations were had.' The witness then proceeded at great length, and without objection, to answer this question. Near the close of his answer he states the proposition which he made to Woodworth in regard to repairs, and proceeds as follows: 'This he agreed to do, and he was knowing to all the work that was done. All of it was necessary to the good of the house, and he got the benefit of it all.' When the deposition was offered in evidence on the trial, and not before then, objection was made to so much of the answer as we have quoted. This was overruled, and complaint is made of the ruling of the court in that regard.

''It is objected that the statement, 'This he agreed to do,' was the statement of a conclusion merely and incompetent. The witness was not stating the effect of any agreement, but the language used was equivalent merely to a statement that Woodworth assented to Thompson's proposition. Probably the witness should have been required, if possible, to state the language; but while our Code allows exceptions to depositions for incompetency to be made at the trial (Code, sec. 390), still, where the objection is of this character, going merely to the form of a question or answer and is directed against only a portion of an answer to a question calling for a narrative statement, and no objection has been made to that question, the court is justified in overruling the objection when made for the first time on the trial of the case, even though the portion of the answer objected to is not strictly competent. This objection being directed

against a portion of an answer to a question not calling for such an answer in such form is similar to a motion to strike out incompetent testimony after it has been admitted. The answer being material and of a probative character it should not be struck out where no opportunity was given, by objection to the form when the deposition was taken, to establish the same fact in a more regular manner.'' See also, 8 R. C. L. 1157, 1158; 18 C. J. 687, 688; and I. C. Railroad Co. v. Foulks, 191 Ill. 57, 74.

Coming now to defendants' objections and motions to strike, their first objection was properly overruled because the testimony objected to was clearly relevant. The equity of the rule we have just discussed clearly appears when we consider the trial court's ruling on defendants' next objection in the form of a motion to strike out parts of Wolcott's answer. The question called for a narrative reply and among other things he said that ''it was understood that we were to share in all this British business with Mr. Guyton and Mr. Harrington.'' Such evidence is not wholly without probative value and is insufficient or irresponsive rather than incompetent. The objectionable feature of the answer might then and there have been obviated if specially pointed out. Nevertheless, in the presence of an experienced and capable commissioner appointed by the court with power to hear, rule upon and preserve objections, defendants' counsel stood mute, reserving their objection until the trial when death had sealed the lips of this witness. The motion to strike should have been overruled as to this part of the answer, and it was properly overruled as to the remainder. For similar reasons defendants' third and eighth objections should have been overruled. Defendants' fourth and fifth objections in the form of motions to strike were properly overruled. Although the questions were leading and possibly called for. conclusions the record does not show that they were objected to at the time. The record does not show that any reason was assigned for defendants' seventh objection and it should have been overruled. Defendants' sixth objection in the form of motion to strike out an answer stands on a different footing. It was made at the time on the grounds that the answer was a conclusion of the witness and not responsive to the question. The answer was responsive to the question in view of the fact that the witness expressed doubt as to his ability to ''state the conversation exactly,'' (more than eight years had elapsed since its alleged occurrence), but the conversation should have been stated if possible and it was subsequently given. The objection should have been sustained as to the words ''it was perfectly agreeable to them to do so, . . . and they were perfectly agreeable to the sharing in it at this time,'' and overruled as to the remainder of the answer.

Counsel for respondents insist that the credibility of the foregoing testimony was seriously impaired by a portion of Wolcott's testimony given on his direct examination by defendants' attorneys, and by parts of his deposition given in 1919 and 1920, in the case then pending of Henry M. Wisler v. J. D. Guyton et al., and the memorandum opinion of the trial judge indicates that he entertained this view. After a careful study of all the testimony, which is before us as it was before the trial judge only in the form of depositions, we are not so impressed.

We quote as follows from the supposedly offending part of his deposition given in his own case on October 30, 1922:

"Q. How long after the Stock Yards Horse & Mule Company was organized was the Wolcott, Beers & Grant Company organized? A. I couldn't tell you.

"Q. You couldn't say about that? A. No, sir.

"Q. Did Wolcott, Beers & Grant Company do any business other than under the name of Wolcott, Beers and Grant? A. It was just a subsidiary company.

"Q. So that the parent company of the whole thing was the Stock Yards Horse & Mule Company? A. Yes, sir.

"Q. And the books that have been spoken of were the books of the Kansas City Stock Yards Horse & Mule Company? A. Yes, sir.

"Q. And if the books of the Kansas City Stock Yards Horse & Mule Company are in existence and produced they ought to show the entire transaction between Beers and Grant and yourself and Mr. Guyton and Mr. Harrington, is that right? A. That is right.

"Q. So that there isn't any claim made in this matter outside of the claim that arises from the Stock Yards Horse & Mule Company, is that right? Yes, sir, that is right."

It will be observed that defendants' counsel himself suggests the idea that the Stock Yards Horse & Mule Company was "the parent company of the whole thing." Bearing in mind that defendants never produced all of the books of this corporation, that it had several subsidiary business entities, and that Wolcott testified that J. D. Guyton, W. R. Harrington, Beers, Grant and he agreed that their participation in all of the profits of all of the companies, including the Guyton & Harrington Mule Company, in all of the business with the British Government, should be in the proportions that they held stock in this corporation, we do not think the witness stultified himself by the above or any other answers that have come to our notice when read in the light of their context. Certainly any superficial inconsistency therein was removed by the following questions and answers subsequently appearing in his cross-examination:

"Q. In Mr. Lucas's direct examination, in asking you about the books of the Kansas City Stock Yards Horse & Mule Company, he asked you this question—'Q. So that there isn't any claim made in this matter outside of the claim that arises from the Stock Yards Horse & Mule Company, is that right? A. That is right.' Now I want you to explain that answer there to that question? A. What is the question?

"THE COMMISSIONER: Read the question (question read). I don't just understand that quite myself.

"Q. Well, it is true that in your claim here that you are not claiming anything except an interest in the business that was transacted by the Stock Yards Horse & Mule Company? A. No, sir, I am claiming an interest in all the companies.

"Q. In all the companies? A. Yes, sir, *that was the representation all the way through,* all the companies, and I am claiming the share as my stock represented."

The words which we have underscored were stricken out on motion of defendants' counsel, made for the first time at the trial, on the stated ground that they were a conclusion of the witness. For reasons heretofore discussed the motion should have been overruled.

"Q. Are you claiming your share, your one-sixth share, in the profits then on all of the business you did with the British Government?"

The above question was stricken out on objection of defendants' counsel, made for the first time at the trial, for the stated reason that "it is assuming that he had a share and that that share is one-sixth interest in the profits of all the business." This objection also should have been overruled. The answer, too, was erroneously stricken out. Like other answers so eliminated it is not shown in the record. Having been objected to by defendants they were presumably unfavorable to them.

The Wisler suit, above mentioned, was a proceeding upon an alleged oral agreement of joint adventure between Wisler, J. D. Guyton, W. R. Harrington, Wolcott, Beers and Grant. It was commenced long after J. D. Guyton's purchase of the Wolcott interests on March 1, 1916. On August 13, 1919, plaintiff began taking Wolcott's deposition in that case and on his direct examination he testified in part as follows:

"Q. What business were you engaged in, say January, January 1, 1915? A.. The commission business.

"Q. Handling what commodities? A. Horses and mules.

"Q. In what way were you engaged in it, what companies? A. The Stock Yards Horse & Mule Company, Wolcott, Beers & Grant.

"Q. Were you interested also in the Guyton & Harrington Horse & Mule Company? A. No, sir.

"Q. The Stock Yards Horse & Mule Company, was that a Missouri corporation? A. Yes, sir.

"Q. How was the stock held in that company, who were the stockholders and in what proportion did they hold the stock? A. I held one-sixth of it; Grant, J. M. Grant, H. M. Beers each held a like amount.

"Q. Each held one-sixth? A. Guyton & Harrington held the three-sixths, plus one share, making them fifty-one per cent.

"Q. Now you say you were also interested in the Wolcott, Beers & Grant Company, was that a corporation or a co-partnership—just rather state what sort of an organization that was? A. · It was a corporation.

"Q. Incorporated under the laws of what state? A. Missouri.

"Q. Where did it have its place of business? A. Why, principally had it at the yards.

"Q. What was its business? A. It was sort of a subsidiary company.

"Q. Subsidiary company to which other companies? A. The Stock Yards Horse & Mule Company.

"Q. In what way was it a subsidiary, how did they transact their business? A. Well, we each held a like amount of stock in it; that is, the Stock Yards Horse & Mule Company.

"Q. Which one of these companies had been organized first? A. The Stock Yards Horse & Mule Company.

"Q. And what was the object of you gentlemen who owned the Stock Yards Horse & Mule Company in forming this other corporation, the Wolcott, Beers & Grant Company? A. Well, for trade purposes, we having been in business some time thought we might do it good.

"Q. The two companies were operating together jointly, were they, as a single business enterprise? A. Yes, sir.

"Q. And what was their connection with Guyton & Harrington Horse & Mule Company? A. Guyton & Harrington were stockholders in this company, in the Stock Yards Horse & Mule Company.

"Q. Guyton & Harrington owned the stock in the Guyton & Harrington Horse & Mule Company, did they? A. I don't know anything about that company, but I suppose so. They owned stock in the Stock Yards Horse & Mule Company.

"Q. And did they own stock also in the Wolcott, Beers & Grant Company in the same proportion? A. The same proportion, yes sir."

It is said that the above is inconsistent with Wolcott's subsequent testimony as to joint adventure. It is evident that these inquiries were directed and understood as directed to the matter of stock ownership in the corporations mentioned, and Wolcott's answers

were exactly in line with the facts. He never owned any stock or interest in the Guyton & Harrington Mule Company. His share or interest under the alleged joint adventure, as shown by his petition and testimony, was in the profits realized to each of the parties from the various mentioned business entities furnishing horses and mules to the British Government and allied powers during the period of the World War. On cross-examination Wolcott further testified in part as follows:

"Q. Now I am asking, Mr. Wolcott, about the individual capacity of the gentlemen I have just named, without reference to any interest that they may have in corporations, I will get you now to state to the commissioner if you gentlemen ever entered into any contract as individuals with Mr. Wisler, the plaintiff in this case? A. I don't know as I understand your meaning.

"Q. I am speaking now about you individually, not in your relationship as a stockholder or director or anything of that kind in a corporation; did you, individually, or either of these gentlemen individually, so far as you know, enter into a contract with Mr. Wisler of any nature or character whatsoever concerning the dealing in or handling of horses and mules?"

(Here follow objections, arguments thereon and rulings by the Commissioner.)

"A. Well, I don't just know how I can give you an intelligent answer, if I understand it. I am willing to answer anything that I can. Of course, I have said here previous to this that we did instruct Mr. Wisler upon leaving here to go to Morgans. I don't know whether that would be any allusion to the contract or engagement, or anything, of that kind, or not. When we figured that we were in trouble we asked him to go and see his friend in Morgans, but I do not know, consider that a contract, or—

"Q. (interrupting) I am not speaking about a contract; did you at any time as J. C. Wolcott, individually, have any negotiations with Mr. Wisler concerning a joint undertaking between you and him and between Harrington and Beers and Grant and Guyton outside of your relationship to the Stock Yards Horse & Mule Company? A. Well, I wouldn't—"

(Here follow objections, arguments thereon and rulings by the Commissioner.)

"A. Well, I never entered into any contract myself in anyway. It was only for the firm, for the business. Any agreements, if we have a contract here, that was for the firm. I don't know whether they are charging that to me as an individual or not. I am sure I don't know. I don't know as I understand your meaning, I guess I am dull.

"Q. Now, Mr. Wolcott, I think if you understand my meaning that you will conclude very definitely that you could have occupied a dual capacity. You could have been there individually and entered into this contract, without regard to the company; you could have been there for the company and entered into it for the company, without binding yourself individually, or intending to bind yourself individually; now were you there in any transaction that was had with Mr. Wisler pertaining to this matter for yourself or for the company?"

(Here follow objections, arguments thereon and rulings by the Commissioner.)

"A. I never done anything in any capacity only for the company as a corporation, in which I was interested.

"Q. Yes; so if I get your statement correctly, Mr. Wolcott, you did not enter in as an individual to any negotiations with Mr. Wisler pertaining to this transaction whatsoever? A. None whatever, sir.

"Q. Now did either one of your associates, so far as you know, enter in as individuals, or did they enter in, if at all, as representatives of that corporation?"

(Here follow objections, arguments thereon and ruling by the Commissioner.)

"A. Not to my knowledge.

"Q. Not to your knowledge; Mr. Wolcott, during the entire negotiations, from their inception up to the time of the cancellation of the alleged contract upon the part of Mr. Wisler, were any of you gentlemen acting in any other way or manner than for and on behalf of your companies, respective companies, so far as you are concerned or knew?"

(Here follow objections, arguments thereon and ruling by the Commissioner.)

"A. Not to my knowledge.

"Q. Not to your knowledge; so that whatever transactions there occurred between Wisler and you gentlemen were as representatives of the companies in which you had stock, and not individually?"

(Here follow objections, arguments thereon and ruling by the Commissioner.)

"A. Never had any arrangement personally, myself, at all."

We do not think the above or any other part of this deposition seriously contradicts Wolcott's subsequent testimony in his own case. It is argued that if in fact there had been a prior agreement of joint adventure, as now claimed, to which Wisler was not a party Wolcott would have volunteered full information regarding it in this deposition taken by Wisler's counsel. While it may be inferred

from the record that Wolcott and Wisler were friends of long standing and Wisler endeavored to make the most of that friendship, it is also apparent that Wolcott carefully refrained from coloring his testimony or volunteering extraneous facts that might embarrass his former business associates. This testimony was given several years after he had parted with his interests to J. D. Guyton and before he learned that he had been defrauded. Why should he have testified gratuitously and irrelevantly in this case concerning another and different agreement of joint adventure to which Wisler was not a party?

We have quoted at length from Wolcott's depositions because his testimony relative to the alleged agreement of joint adventure has been assailed bitterly by respondents, and to some extent apparently misunderstood by the trial judge. It may be that if he had lived to testify orally at the trial, as three of his associates did whose depositions were taken at the same time, his testimony as a whole would have been clearer, more forceful and comprehensive, but we must rule the case upon the record made. The plain import of what he did say is that about the time the European War began and the first order came in from the British Government, with the prospect in view of furnishing large numbers of horses and mules to the British Government during the World War, J. D. Guyton, W. R. Harrington, Beers, Grant and he agreed that they would not share any of this business with "outside people," as they had done during the Boer War, but would keep it among themselves and that the profits realized through the participation therein of their various companies, including the Guyton & Harrington Mule Company, would be divided among the five agreeing parties in proportion to their share holdings in the Stock Yards Horse & Mule Company at the time of the agreement. The fact that some of Wolcott's testimony was elicited by leading questions does not affect its admissibility at this time because no such objection was then made, and although some of his answers were in the nature of conclusions, yet they are not irrelevant or without some probative value on the issues presented. An agreement is defined in The American Law Institute's Restatement of the Law of Contracts (official draft Sec. 3), as "an expression of mutual assent by two or more persons." Enough of the circumstances and conversation were detailed by this witness to show that he made such a proposition to his four named associates and that they agreed to it. He further testified that at the same meeting Guyton said that they hadn't the money then and couldn't furnish the money that was necessary to go on with the business and requested him to go and see Mr. Swinney, and that pursuant to this conversation he did arrange with Mr. Swinney for the First National Bank at Kansas City to lend the Stock Yards

Horse & Mule Company more than a half million dollars to finance the business of furnishing horses and mules to the British Government, and that J. D. Guyton, W. R. Harrington, Beers, Grant and he signed written personal guaranties therefor.

J. D. Guyton, in his deposition given on November 30, 1922, the same day that Wolcott commenced giving his deposition, and again in his oral testimony at the trial about three years later, denied that Harrington, Wolcott, Beers, Grant and he had any agreement or understanding that they would share the profits realized from the sale of horses and mules to the British Government on any basis except through their individual ownership of shares of stock in the various companies in which they were interested. Relative to the inception of the business he testified at the trial that some time in August, 1914, he received a cablegram from General Fairbanks from London, England, requesting him to meet General Sir Frederick Benson at the Queen's Hotel, Toronto, Canada, regarding horses; that he thereupon called Beers, Grant and Wolcott together, notified them that he held this cablegram, that he was cognizant that the British wanted to buy horses just as they did during the Boer War, that he was going to Canada as requested and wanted Beers to go with him. He further testified that Beers and he made the trip and secured an order for horses from the British Government in the latter part of August. He explained the fact that from that time until about July 1, 1915, practically all of the horses and mules delivered by the Guyton & Harrington Mule Company to the British Government from Kansas City territory were furnished by the Stock Yards Horse & Mule Company, by stating that on his return to Kansas City with the first order for horses he had Beers, Grant and Wolcott meet him in the Guyton & Harrington Mule Company office at the stock yards there and all agreed that the Stock Yards Horse & Mule Company would exercise its right under a written option agreement, said to have been executed about 1901 and lost in the flood of 1903, to furnish all the horses that he had a contract or might obtain a contract to furnish to the British Government, and that it should have the entire profits therefrom. He testified further that there was no agreement regarding mules at that time, but that later he received a cablegram from London to meet General Bridge, head of the mule department of the British Remount Commission, at Toronto, and two months or more after the first order for horses was received he entered into an agreement with General Bridge to furnish mules; that because General Bridge wanted the mules inspected and delivered at Kansas City and because the Guyton & Harrington Mule Company had no barns there at that time it was agreed between him, his son Frank, Harrington, Wolcott, Beers and Grant that the Stock Yards Horse & Mule Company

could have the profits realized from mules it put in at Kansas City, and that this arrangement continued until about the middle of April, 1915, when General Bridge became dissatisfied with Grant's handling of the mules, and the mule inspection was removed from Kansas City to the near by town of Lathrop, Missouri.

The probative value of Guyton's denial of the special business-getting, operating and profit-sharing agreement testified to by Wolcott is appreciably impaired by the shifting tendency of his own testimony subsequent to the production and disclosure of evidence persistently forced by plaintiff's counsel. For instance, in his deposition given three years before the trial, when examined specifically with reference to horses and mules furnished the British Government, he testified that the only profit made on them by the Stock Yards Horse & Mule Company was the commission it received from shippers. This testimony, if true, would have been strongly corroborative of his claim that there was no such agreement as Wolcott claimed. However, subsequent disclosures shattered this explanation, and then at the trial he brought forward the claim, never previously mentioned by him or any of his associates and absolutely at variance with their depositions, that the immense business of furnishing horses to the British Government and all profits arising therefrom went to the Stock Yards Horse & Mule Company by virtue of its exercise of rights under the alleged written option agreement. Likewise, at the trial it was first claimed that the business of furnishing mules from the Kansas City territory with all profits arising therefrom went to the Stock Yards Horse & Mule Company, notwithstanding the alleged option agreement was said to contain a provision that this company should not handle any mules. The Stock Yards Horse & Mule Company continued to furnish mules under this arrangement until some time between the middle of April and July 1, 1915. An idea of the volume of business it thus transacted may be formed from statements prepared from its books and the books of the Guyton & Harrington Mule Company and introduced in evidence, showing that the first named company furnished and delivered to the British Government from Kansas City territory, through and without profit to the last named company, between September 1, 1914, and June 30, 1915, 49,979 horses for $9,862,755, and 25,538 mules for $4,501,496.30. It is highly improbable that the resulting profits, especially those from the mule business which without some special agreement would have been realized by Guyton and Harrington exclusively if the business had been retained by the Guyton & Harrington Mule Company, would ever have been surrendered to the Stock Yards Horse & Mule Company even though the British Government required an inspection at Kansas City and the Guyton & Harrington Mule Company had no available barns

there at that time, unless Guyton, Harrington, Wolcott, Beers, and Grant were in some such agreement as that testified to by Wolcott. Harrington testified at the trial that the inspection was moved back to Kansas City about January 1, 1916, and at that time there seemed to be no difficulty in getting barns. The context of Guyton's deposition does not bear out his subsequent claim that he was then testifying as to the pre-war methods of doing business between these corporations. Furthermore, neither he nor his associates ever intimated in their depositions that W. R. Harrington was called to Kansas City and the mule inspection moved to Lathrop because of Grant's delinquency. In fact Guyton in his deposition positively denied that they had ever had any trouble about inspections with the British Government, and even at the trial Beers declined to say that Grant did not properly handle the mule business and indicated that Guyton and Harrington arbitrarily took the business away from the Stock Yards Horse & Mule Company because they owned a majority of the stock and had power to do so.

Grant's testimony was never taken. Depositions of both W. R. Harrington and Beers were taken in 1922 and 1923. They also testified orally at the trial two or three years later. On both occasions they denied that there was any agreement to share in the profits of the war business except on the basis of stock owned by the shareholders of the various corporations. However, as already suggested, the force of these denials is considerably weakened by their own conflicting testimony. Both apparently agreed in their depositions that there was a meeting attended by all five of the parties about September 1, 1914, when the first order for horses was received, at which time the manner of handling the business and sharing the profits was discussed. Later at the trial Harrington denied that he attended this meeting. In their depositions they disagreed with Guyton's testimony that the Stock Yards Horse & Mule Company's profits on horses was limited to the commissions it charged shippers. As to mules, Beers further testified that the Stock Yards Horse & Mule Company received all the profits except $5 per head, afterwards increased to $10 per head, while Harrington stated that all of the profits on the mules went to Guyton & Harrington Mule Company except that when a buyer in the field for the Stock Yards Horse & Mule Company occasionally picked up a mule a commission of $5 a head was allowed thereon which went to the Stock Yards Horse & Mule Company. At the trial, however, these defendants shifted position on these important matters and joined Guyton in his final explanation above mentioned. Counsel for defendants seek to excuse this complete change of front by suggesting that defendants were taken by surprise and testified from imperfect recollections of their business transactions,

1078

This plea might be taken as a confession that Wolcott, even after years of illness and business inactivity, had a more comprehensive and accurate memory of its general scope and conduct at the particular time in question than they had. At least no such aberration appears in his testimony. But Wolcott's suit had been pending for months. These defendants apparently were in good health, mentally alert, diligent, resourceful and fully aware of the grave charges made against them. They were represented throughout by able counsel who assiduously advised them and persistently fought for every advantage that might safeguard their interests. It is not likely that they testified inadvertently or without the benefit of all the facts, knowledge of many of which was then peculiarly available to them.

Respondents count much on the testimony of Guyton and Beers given at the trial relative to the Lathrop meeting held on July 3, 1915. Beers said that the day before Wolcott, Grant and he had discussed the advisability of trying to get some of the Guyton & Harrington Mule Company business to make up for the loss incident to removal of the inspection from Kansas City to Lathrop, that at the Lathrop meeting Wolcott asked that some of the profits of the East St. Louis business be given to the Stock Yards Horse & Mule Company, and Harrington refused to consider the request. Guyton testified that at this meeting he (Guyton) suggested that if they opened a mule buying station at Sacramento the Stock Yards Horse & Mule Company could have the profit on mules put in there. In his deposition given three years before Wolcott was asked nothing about any such conversations, though he testified that at this meeting Harrington complained that he was not getting enough salary and declined to put the East St. Louis mule business in the "jack-pot" as he had formerly agreed to do, on the ground that it was too much work and his son who had been running the business there wouldn't agree to it. If the things testified to by Guyton and Beers actually transpired at the Lathrop meeting it seems strange, indeed, that Harrington who was also present failed to corroborate them, and that Beers when examined regarding this meeting shortly after Wolcott's deposition was taken failed to mention anything of the kind.

Bearing in mind that the existence of an agreement of joint adventure may also be inferred from the acts and conduct of the parties, we now turn to facts and circumstances in evidence some of which in the opinion of the trial judge, who alone had the advantage of seeing and hearing all the litigating parties except Wolcott on the witness stand, outweighed the denials of these three defendants and other evidence introduced in their behalf on this question. It has been well said by the Supreme Court of Oklahoma

in O. K. Boiler & Welding Co. v. Minnetonka Lbr. Co., 229 Pac. 1045, 1047, 1048, 103 Okla. 226:

"Whether a joint enterprise has been created or not may be determined from the apparent purposes and the acts and conduct of the parties who join in the undertaking. The acts and conduct of the parties engaged in the accomplishment of the apparent purposes may speak above the expressed declarations of the parties to the contrary."

The cablegrams that Guyton said he received from London were never introduced in evidence. Correspondence between Beers and Col. F. B. Drage of the British Remount Commission, commencing as early as August 22, 1914, shows that Guyton had the active assistance and cooperation of his above-named associates in securing this business. Mention has already been made of the fact that Beers accompanied him on his first visit to Toronto. Telegrams were introduced in evidence from Wolcott to J. D. Guyton at Toronto under date of October 14, 1914; from Beers to George S. Stroud at Atlanta, Georgia, under date of October 15, 1914; from Beers to J. D. Guyton at Port Chalmette, Louisiana, under date of January 20, 1915; from Beers to F. H. Gilroy, Sacramento, California, under date of August 6, 1915; from J. D. Guyton to Grant at Sacramento under date of August 10, 1915; from Beers to Gilroy at Sacramento under date of October 4, 1915; and from Wolcott, Beers and Grant by H. M. Beers to F. W. Brenneman at Los Angeles, California, under date of December 3, 1915, all showing that Wolcott, Beers and Grant were active in the transaction and control of the business of furnishing mules as well as horses to the British Government.

In the very beginning the parties were confronted with the serious problem of financing this vast enterprise. The evidence shows that on September 1, 1914, the Stock Yards Horse & Mule Company had net assets above all liabilities of $415,255.03, while the total liabilities of the Guyton & Harrington Mule Company exceeded its total assets by $209,912.62. It appears that Wolcott, individually, and the Stock Yards Horse & Mule Company, as a corporation, enjoyed extensive credit at the First National Bank in Kansas City where they did business. J. D. Guyton testified that he alone could have borrowed from the Southwest National Bank of Commerce at Kansas City, where the Guyton & Harrington Mule Company did business, sufficient funds to have handled the entire business. We are only interested, however, in what was actually done. Beers testified that after the meeting at which the method of financing the enterprise was discussed Wolcott did go and see Mr. E. F. Swinney, President of the First National Bank, and reported that "Mr. Swinney said 'Go ahead,' that he would take

care of us.'' Mr. Swinney's testimony fully corroborates Wolcott's assertion that J. D. Guyton, W. R. Harrington, Wolcott, Grant and Beers signed and delivered to this bank written personal guaranties upon which funds aggregating about $600,000 were made available to the Stock Yards Horse & Mule Company, by loans made to it in its corporate capacity and in the trade name of Wolcott, Beers and Grant, for the purchase of horses and mules for the British Government. Mr. Swinney further testified that the credit thus obtained was to be used by Wolcott, Beers & Grant, the Kansas City Horse & Mule Company and the Guyton & Harrington Mule Company for the purchase of horses and mules; that they were going in together. Defendants' objections on the grounds of hearsay and conclusion were apparently never definitely ruled. A careful study of borrowings and bank balances of the Stock Yards Horse & Mule Company and the Guyton & Harrington Mule Company, and payments made by the latter to the former, discloses the significant fact that while prompt payments in full for animals delivered were made by the British Government the latter company always retained heavy balances therefrom, although, absent some special understanding or agreement, such payments should have been transmitted in full and without delay to the first named company. Between September 8 and 21, 1914, the Guyton & Harrington Mule Company borrowed $150,000 of the Commerce Bank, but by October 7, 1914, with the aid of balances so retained out of proceeds received for horses furnished by the former company, it had paid off all of this new indebtedness and $90,000 of its old indebtedness at the bank. This practice continued and the balances thus retained became larger when the mule business began in the latter part of October, 1914. By November 28, 1914, the indebtedness of the Stock Yards Horse & Mule Company at the National Bank had been increased to $510,000 while the Guyton & Harrington Mule Company on that date was retaining a balance due it of $609,656.77. In the meanwhile the Guyton Company was expending $137,000 which was finally charged to the Stock Yards Horse & Mule Company, in acquiring additional ground and reconstructing for its own use facilities owned by the Wolcott, Beers & Grant Horse & Mule Company at East St. Louis. At the same time it was making huge outlays at Port Chalmette, and largely financing the Womack & Stroud Mule Company in its purchase of mules in the South. The testimony shows that from September 9, 1914, to February 29, 1916, these balances ranged from $125,695 to $1,233,723.64 and no interest was ever paid thereon, whereas, prior to September 1, 1914, interest had been regularly charged on unpaid balances. This method of doing business though less obvious was just as effective in furnishing financial assistance to the Guyton

& Harrington Mule Company as if J. D. Guyton, W. R. Harrington, Wolcott, Beers and Grant had to that extent signed personal guaranties at banks for that company.

Various items of expense such as railroad fares of J. D. Guyton and others incurred in the acquisition and transaction of mule as well as horse business were charged to the Stock Yards Horse & Mule Company, and such charges are consistent with the fact that to this company had been allocated the transaction of all of the horse business and a substantial part of the mule business. However, if there was no agreement that Wolcott, Grant and Beers should eventually participate in profits realized to Guyton and Harrington from mule business transacted by the Guyton & Harrington Mule Company it seems that at least a portion of this expense would have been charged to the latter company.

We have already stated in a general way the history, scope and interrelated character of the business transacted by the various corporations, partnerships, trade names and individuals here involved, but the written contract of sale and purchase executed by J. C. Wolcott and J. D. Guyton on March 1, 1916, deserves special consideration. It not only purports to convey Wolcott's stock in the Stock Yards Horse & Mule Company, the Womack & Stroud Mule Company, the Wolcott, Beers & Grant Horse & Mule Company, and all his interest in the profits and earnings of the C. & A. Horse Company, but also contains the following provision (italics ours):

*"The seller hereby releases the Guyton and Harrington Mule Company and J. D. Guyton from any and all claims and demands of every kind and nature which he has or can or may have against it or him,* and the buyer agrees to save the seller harmless from any and all liabilities and expenses relating to any leases heretofore made by the seller or by Wolcott, Beers and Grant and assigned to Wolcott, Beers, Grant Horse and Mule Company, or The Stock Yards Horse and Mule Company, and also by reason of any renewals and extensions of said leases."

Guyton testified that this contract was prepared by F. F. Rozzelle as attorney for Wolcott and not for him. The instrument as a whole is skilfully drawn and evidently the work of an astute, well informed and experienced counselor who knew exactly what he wanted to say and said it without cumbering the agreement with mere cautionary generalities. In the light of evidence already reviewed the apparent purpose of the words which we have italicized was to protect Guyton from any claim or demand that Wolcott had, or could have, or might thereafter have for a share in profits realized to him from business transacted by the Guyton & Harrington Mule Company. If they had any other meaning no one was in a better position than J. D. Guyton to explain what it

was, but he failed to do so. A similar clause appears in Guyton's contract of purchase with Grant executed a few days later and prepared by the same attorney, and Guyton ventured no explanation of its purpose or meaning. Both Rozzelle and Grant died before their testimony could be taken in this case.

However, on the whole record we are not left in doubt as to the real purpose and meaning of the above clause and its evidentiary value in proof of the existence of the alleged agreement of joint adventure. Some months later a written contract, which we have already mentioned, was prepared by the same attorney and executed on November 21, 1916, by the Guyton & Harrington Mule Company, of the one part, and H. M. Beers, of the other part, which provided that the latter should receive one-eighth of the net profits of said corporation from the beginning to the end of the World War from "all sales of horses and mules including cotton mules at all locations" and from "the feeding and care of horses and mules at all locations," with certain specified exceptions as to the latter. The last clause of this contract is very illuminating. It is as follows:

"Any and all rights, claims and demands under any verbal agreement heretofore made or claimed to have been made by which any individual holder of stock of The Stock Yards Horse and Mule Co., who is not a stockholder of Guyton & Harrington Mule Company, would share in the net profits of Guyton & Harrington Mule Co. are hereby released and cancelled and no right or claim shall exist under any such agreement."

The five alleged joint adventurers were the only holders of stock in the Stock Yards Horse & Mule Company. Wolcott, Beers and Grant were the only members of this group who were not holders of stock in the Guyton & Harrington Mule Company. Guyton already held written contracts from Wolcott and Grant protecting him from the enforcement of any such claim by them. If Beers had any rights under a verbal agreement they were still outstanding in a manner hazardous both to him and to Guyton and Harrington, especially so to the latter two, because Beers was still active and aggressive in business, and, it may well be inferred from the record, in possession of highly confidential information. The above provision was plainly intended to meet this emergency, though so adroitly phrased that the parties could, as they finally did, deny the very existence of such an agreement. After a thorough study of all the evidence we are satisfied that this clause must be taken as an admission that Beers had or was claiming to have some such rights, and strongly probatory of the existence of the pleaded agreement of joint adventure, because the claimant's rights were in virtue of his holdings of stock in the Horse Com-

pany and not in the Guyton Company. Guyton and Harrington offered no explanations. Beers insisted that no one at that time or prior thereto asserted any such right, claim or demand. Speaking within the record it cannot be said that there was any good reason why this should have been inserted as a mere general cautionary provision. These three men knew what, if any, verbal agreement had been entered into between the five. Why this provision if no such agreement existed? If there was such an agreement the necessity of committing Beers to such a provision is apparent. It is also significant that prior to plaintiff's discovery of this and other written agreements now in evidence defendants stoutly denied that Beers ever acquired any interest in the stock Guyton obtained from Wolcott and Grant or in any profits of the Guyton & Harrington Mule Company. Noteworthy, too, is the fact that on the same day, November 21, 1916, the heretofore mentioned written agreement between the Guyton Company and the Horse Company was executed giving the latter company all profits on all World War horse business, although defendants say this matter was determined in September, 1914, by recourse to the so-called "option agreement."

It may be observed at this juncture that we are not favorably impressed with the argument that if there had been an agreement of joint adventure it would have been evidenced by a written contract, or by a transfer of Guyton & Harrington Mule Company stock to the parties interested, as was done in dividing the profits on mules furnished the British Government during the Boer War. Some such definite arrangement was obviously necessary in that venture. Guyton and Harrington had then but recently established a business at Kansas City. A number of independent dealers, more or less strangers to each other, were associated in this enterprise. Wolcott testified that the arrangement did not prove satisfactory and in entering upon the World War venture he proposed, and Guyton, Harrington, Beers and Grant agreed with him, that they have their share of the business themselves "and not give it to outside people." This agreement must have included the mule business, because that was the only business that they had ever shared with "outside people." At that time these five men had been closely associated in business for more than fifteen years. They were all active, aggressive, experienced in the horse-and-mule business, and apparently had full confidence in the integrity and ability of each other. If ever men would be justified in entering into an oral agreement of joint adventure it would be under such circumstances. Moreover, there were other conditions which apparently moved them not only to refrain from reducing this agreement to writing, but thereafter to couch all written references

thereto in the most careful if not cryptic terms. J. D. Guyton testified that during the World War there was a strong feeling of jealousy and bitterness on the part of other dealers toward him and his associates, based on a belief that they had created a monopoly for themselves in the World War business. The record shows that their counsel, Mr. Rozzelle, advised them from time to time against entering into any written agreements that might lend color to this belief, and yet notwithstanding all their precautions two damage suits were filed against them in 1917 wherein they were charged with having been engaged in business in violation of antitrust laws, and they paid the sum of $50,000 in compromise and settlement of this litigation.

Written agreements subsequently entered into, which we have already noted, show that Beers acquired one-fourth of the interests that Guyton had previously obtained from Wolcott and Grant, and also acquired a further interest in the net profits of the Guyton & Harrington Mule Company. From the record lodged here we are unable to determine just how much of all the profits of the war business he finally received. The net results of his negotiations with Guyton and Harrington, in spite of his vaunted ability as a trader, were probably not the exact equivalent of what he should have received under the alleged agreement of joint adventure, but all things considered they were perhaps the best he could get. If there had been no such agreement it seems hardly probable that such substantial concessions could have been brought about solely by his sudden threat to call in the buyers working under him and quit business, as he said. A more reasonable conclusion from all the evidence is that his own intimate knowledge of the conduct and immense profits of the business and an assertion of his own rights under the oral agreement of joint adventure were the real moving considerations.

Other circumstances and arguments too numerous and voluminous to be stated in this opinion have been earnestly presented by able counsel on both sides. All have been carefully analyzed and given the most painstaking consideration. Upon a thorough study of the entire record we find from the evidence that J. D. Guyton, W. R. Harrington, Josiah C. Wolcott, H. M. Beers and J. M. Grant engaged together under an oral agreement as joint adventurers in the business of furnishing horses and mules to the British Government and other belligerent allied powers engaged in the World War, and agreed that the joint adventure should include all of such business transacted by them, the Stock Yards Horse & Mule Company, the Guyton & Harrington Mule Company, The Wolcott, Beers & Grant Horse & Mule Company, the Womack & Nicoll Mule Company, and any other cor-

porations, partnerships or trade names they might form, commencing on or about September 1, 1914, and continuing as long as any of them should be engaged in such business, and that the profits realized to the said Guyton, Harrington, Wolcott, Beers and Grant from such business, including profits from the feeding and care of such horses and mules, whether transacted by them individually or by such corporations, partnerships or trade names, should be pooled and divided among said joint adventurers on the basis of the then stock ownership of each of said joint adventurers in the capital stock of the Stock Yards Horse & Mule Company, to-wit: Two hundred and fifty-two one-thousandths of such profits to J. D. Guyton, two hundred and fifty-two one-thousandths to W. R. Harrington, one hundred and sixty-five and one-third one-thousandths to Josiah C. Wolcott. one hundred and sixty-five and one-third one-thousandths to H. M. Beers, and one hundred and sixty-five and one-third one-thousandths to J. M. Grant.

The next question is, does the evidence sustain plaintiff's charge of fraud? The substance of this plea is that Wolcott, being unfamiliar with the books of account kept by or for said joint adventurers or in which said joint adventurers were interested, having no knowledge of the enormous extent of the profits that had been made. being sick in body and mind and in no condition to inform himself of the true condition of said business, accepted the statements exhibited to him by defendants and their attorney, in whom he had confidence respecting said business, and relying upon their assurances, representations and statements as true, though they were in fact false and made for the purpose of cheating and defrauding him and taking advantage of his illness and helpless condition, he sold and transferred to J. D. Guyton on or about March 1, 1916, all his interest in said joint adventure and certain corporations for a grossly inadequate consideration; that in anticipation and furtherance of their scheme to defraud him defendants fraudulently withdrew and concealed money and other property in excess of $800,000 from the assets of the Stock Yards Horse & Mule Company; fraudulently concealed profits and books of the Womack & Stroud Mule Company and Biddle & Company, causing plaintiff to believe that said profits had been included in the represented total profits of the joint adventure; fraudulently withdrew or caused to be withdrawn from the treasury of the Stock Yards Horse & Mule Company more than $250,000 for the alleged use of the C. & A. Horse Company; fraudulently withheld and concealed profits of the latter company in excess of $163,000 which should have been paid to the former company; and fraudulently concealed from said Wolcott profits earned and received from the feeding of horses and mules for the British Government by the Guyton & Harrington Mule Company which on March 1, 1916, were in excess of $1,000,000.

Wolcott testified that the Guyton & Harrington Mule Company kept the general books and accounts of the entire business at its Kansas City office, and the different companies and branch offices sent monthly reports there. Such an arrangement would be consistent with the fact that this corporation was the sales agency of the joint adventure. He also testified that if all the books kept by the Stock Yards Horse & Mule Company were produced they would show the entire transaction between the five joint adventurers. Whether or not a separate set of books was kept covering only business of the joint adventure, no doubt its transactions were in some manner reflected in records kept by the various corporations, partnerships and trade names, to which the business was allotted. For a long while after this suit was brought plaintiff's counsel were prevented from inspecting them. In resisting court orders for their production defendants filed affidavits containing statements of fact which were misleading and untrue. Examined under oath W. R. Harrington admitted that he took records of the Guyton & Harrington Mule Company from its Kansas City office to Lathrop, but declined to say where he kept them. Defendants produced some books of account, records and documents under protest and compulsion, but many, such as those of the Womack & Stroud Mule Company and books of original entry and other important papers and documents of the Stock Yards Horse & Mule Company, were never produced. Beers's explanation as to the latter was that probably he had destroyed them or given them to the Salvation Army. It might well be expected that plaintiff's claims, if contested at all, would meet with vigorous opposition, but this case is replete with indications of defendants' dilatory, evasive and obstructive efforts to prevent the discovery and production of such records and documents. When, as in this case, the production of a part of such evidence is coerced showing falsity in many substantial particulars of testimony previously given, and this is followed by contradictory testimony and failure, without satisfactory explanation, to produce the remainder, such conduct is in itself a confession of weakness if not a badge of fraud. [Wigmore on Evidence (2 Ed.) sec. 277 et seq.; Greenleaf on Evidence (16 Ed.) sec. 195 et seq.; Pomeroy v. Benton, 77 Mo. 64, 80 et seq.; Haid v. Prendiville, 292 Mo. 552, 565, 238 S. W. 452.]

Much of the evidence here urged in support of fraud is closely interwoven with evidence offered in proof of the agreement of joint adventure. It will be remembered that most of the war business done prior to the middle of April, 1915, was transacted by the Stock Yards Horse & Mule Company. The health of both Wolcott and Grant had begun to break under the strain of their duties. On April 17, 1915, Wolcott left for Denver to open a station there for the pur-

chase of horses. W. R. Harrington left Chalmette about that time, and on the 16th of the same month the records of the Stock Yards Horse & Mule Company show an item of $250 charged for his expenses to Kansas City. Shortly thereafter Grant went to Fort Worth in connection with the purchasing of mules at that place. Adverting to the Lathrop meeting of July 3, 1915, Wolcott's testimony is that Rozzelle there showed him a written statement indicating that all profits from all companies up to that time, including profits of the Guyton & Harrington Company, amounted to more than $3,000,000. Guyton and Beers denied that this statement included profits of the Guyton & Harrington Mule Company and said that the business of that company was not mentioned at the meeting. However, Knaus, bookkeeper of the Stock Yards Horse & Mule Company who was also present, testified that Blees, Lathrop bookkeeper for the Guyton & Harrington Mule Company, was called in during the meeting to answer questions regarding the business of the Guyton & Harrington Mule Company. Under the agreement of joint adventure transfer of the mule inspection to Lathrop would have resulted in no ultimate loss to any of them, so it is immaterial on this issue whether or not Wolcott was then advised that this change had been made. Whether or not he knew that this mule profit account had been set up in favor of the Guyton & Harrington Mule Company might have a bearing upon his subsequent conduct in ascertaining the profits of the joint adventure before selling his interest to Guyton, but even this is of little consequence because it appears from the whole record that all five of the joint adventurers were practical, aggressive men of affairs who gave no personal attention to bookkeeping or questions of law, relying entirely upon the advice of their accountants and legal counsel in such matters. Wolcott was apparently advised that the horse contract with the British expired the latter part of April, 1915, and correspondence between him and Guyton shows that he was interested in the outcome of Guyton's negotiations with the British Government for a continuation of this business, but the evidence as a whole indicates that he knew nothing of the formation of the C. & A. Horse Company, Biddle & Company or the reorganization of the Womack & Nicoll Mule Company until after his return from California in September, 1915, if he was even then advised.

We have already indicated Wolcott's physically helpness condition on his return to Kansas City. For several months thereafter he was confined to his home unable to feed himself and attended by a doctor and a nurse. His wife was taken sick in October, 1915, and died in February, 1916. J. D. Guyton testified that he never saw him after his return from California, but it appears that throughout the fall and winter Rozzelle frequently visited him at

his home. Wolcott testified that in October, 1915, Rozzelle first suggested that he sell his interests, stating that it would be a good plan for him to do so as he couldn't be of any service and his associates probably wouldn't stand for his being out much longer; that from that time on until the sale was consummated Rozzelle was out to see him at least twice a week; that on these visits Rozzelle often suggested that he sell, although he told him he didn't like to do it because he didn't know anything about the business and hadn't known for a long time; that. from September, 1914, until the sale was made, he had no reports of the business or the profits made except what he learned by asking the bookkeeper what was made; that he received no statements; that bookkeeper Knaus came out to see him several times while he was sick, but he was not well enough to talk business and Knaus furnished him no statement whatever of the business; that when Beers came out to see him he was too ill to talk business, and none of his other business associates came to see him; that when he entered into the contract with J. D. Guyton on March 1, 1916, he had no knowledge at all of the condition of the business except what Rozzelle presented to him in the following statement identified in the deposition as Exhibit "A:"

"Mar 1—1916
    J. C. Wolcott

    . Ledger Account ........................... 144,559.62
    Income tax to be paid by)
    Stock Yds H. & M Co.) ..................... 60.00

    Included in above amount           144,619.62
    is 2975.00
    Special cash
    (Written in pencil at bottom:)
        340,000.00
        144,619.00

        195,380.38"

This statement, except the rubber stamped date .and the figures in pencil at the bottom, was identified as being in the handwriting of bookkeeper Knaus. Wolcott further testified that Rozzelle said he had obtained it from the journal of the Stock Yards Horse & Mule Company, and that it represented all his interest; that the figures in pencil were on the statement when it was presented to him, and Rozzelle said the figures "340,000" represented what Guyton was to give him for all his interest in the business and "$144,619" was the amount charged against him on the books; that his relations with Rozzelle at the time were very friendly, and he had been attorney for him and all these different companies for more than twenty years; that Rozzelle told him that $340,000 represented the real value of his one-sixth interest in the business, and that he had the utmost con-

fidence in him and did as he told him to do; that he signed the Guyton agreement at his own home about March 1, 1916, while only he and Rozzelle were present, and Rozzelle gave him a check for the cash balance of $195,380.38; that during all the negotiations leading up to the signing of this contract he believed Rozzelle was acting as his attorney, relied on him as such and had no other; that his first information that he had been defrauded was when William A. Blees, who had kept books for the Guyton & Harrington Mule Company at Lathrop, told him about sixty days before he brought this suit that he had been wronged and his profits in the business were much larger than $340,000; that shortly before he commenced this suit he talked with Rozzelle several times and told him that he wasn't satisfied with the transaction and was going to open it up and try to clear it up; that Rozzelle then told him he was not his attorney, that he had never charged him a thing and there was nothing on the books to show that he ever was his attorney.

J. D. Guyton's testimony relative to the sale was to the effect that Rozzelle came to him in November, 1915, wanting to sell him Wolcott's interest in the business; that he took the matter up with W. R. Harrington and told him that if they bought he thought they should pay Wolcott just what his stock was worth and not try to buy it at any cut-throat price; that Harrington was unwilling to buy, but told him he could do so if he wanted to; that after many visits from Rozzelle he finally agreed to buy Wolcott's interest and after weeks of negotiation agreed on the price of $340,000; that he arrived at this figure from statements obtained from the books of the Stock Yards Horse & Mule Company; that he never saw Wolcott and the only dealings he had were with Rozzelle who indorsed the check he gave him for the cash balance of the purchase price; that Rozzelle was Wolcott's attorney and never represented him at any time. He testified that a few days later he purchased Grant's interest in much the same way for a total consideration of $350,000.

Testifying from books of account and records available, accountant Craig, substantially corroborated by other expert accountants, said that the net worth of the Stock Yards Horse & Mule Company, including all adjustments and amounts due from its subsidiaries, on February 29, 1916, was $2,624,471.07; the profits of Womack & Stroud Mule Company on the same date were $275,185.10; and the profits of the Guyton & Harrington Mule Company from September 1, 1914, to February 29, 1916, were $1,849,578.30. These figures total $4,749,234.47, and show that if the profits derived from the business of the joint adventure from September 1, 1914, to February 29, 1916, had been realized to the five joint adventurers on the latter date in proportion to their stock holding in the Stock Yards Horse & Mule Company, and all other assets and capital stock of said

corporation distributed, Wolcott's share of approximately one-sixth would have been $791,539.08. J. D. Guyton acquired it for the grossly inadequate sum of $340,000. Was Wolcott deceived in the accomplishment of this sale?

If Rozzelle and Guyton obtained the figures which formed the basis of their valuation from books of the Stock Yards Horse & Mule Company only, and such books did not at the time show all the profits of the joint adventure (those produced by defendants did not), then the figures they submitted to Wolcott were inaccurate and he was misled to his injury because he relied entirely upon Rozzelle's diligence and fidelity in ascertaining and advising him of the facts, and apparently believed, as disclosed by his testimony above noted, that books kept by the Stock Yards Horse & Mule Company showed the entire transaction between the five joint adventurers. If, on the other hand, these records did show all the profits of the joint adventure, or if Rozzelle and Guyton examined other records, and there is substantial evidence that they did and that all the books and records of all the corporations and related business organizations were peculiarly familiar and accessible to them, then they must have known that $340,000 was nothing like the true value of Wolcott's interest, and the burden was upon defendants to show that these men frankly disclosed to Wolcott all relative information available to them, or that Wolcott was as well informed as they were regarding the pertinent facts.

Realizing this burden respondents strongly rely on Exhibit 500, pages 1, 2 and 3, which first appeared in the hands of one of their counsel during his cross-examination of bookkeeper Knaus in 1924. It bears date of November 26, 1915, and, exclusive of figures in pencil on page 2, purports to be a list of assets to amount of $1,-826,538.07 and liabilities to amount of $174,051.64 of Wolcott, Beers and Grant. Beers testified that he first saw this statement in the hands of Wolcott at his home about the time of the date it bears; that he procured from J. D. Guyton or his bookkeeper the amount of C. & A. Horse Company profits then in Guyton's hands, which was $162,537.50, and wrote it in pencil on the statement, as well as the sum of $250,000 which he and Wolcott thought could be realized from real estate of the Wolcott, Beers & Grant Horse & Mule Company. The entire statement, except pencil notations, is in the handwriting of Knaus, who said that he had prepared it, at the request of either Rozzelle or Wolcott he didn't know which, from the books of the Stock Yards Horse & Mule Company, and that it was intended to represent the assets and liabilities of that company. Wolcott never mentioned any such statement in his deposition. If it was prepared for and delivered to him and last seen by Beers in his hands, why was it not found among his papers rather than in the

hands of defendant's counsel? But even if Wolcott saw it, and Beers supplied certain information and added certain figures in pencil and went over it all with him (matters inconsistent with Beers' earlier testimony), the statement, if used as a basis for the determination of the value of Wolcott's interest in the joint adventure, was misleading. It contains no reference to profits of the Guyton & Harrington Mule Company or of the Womack & Stroud Mule Company. Even if only used as a basis for determining the value of Wolcott's interest in the Stock Yards Horse & Mule Company as of November 26, 1915, it is inaccurate. As prepared by Knaus it contained no reference to the Wolcott, Beers & Grant Horse & Mule Company indebtedness, then amounting to more than a half million dollars. This omission is sought to be met by Beers's pencil notation $250,-000, without explaining how this paper writing ever passed from the hands of Wolcott into the possession of defendants. It contained no reference to profits of the C. & A. Horse Company amounting to $163,278, which funds appear to have been in Guyton's hands at that time and not turned over to the Stock Yards Horse & Mule Company until the following May. This is sought to be explained by Beers's pencil notation of the slightly different amount of $162,-537.59, and by entry on February 24, 1916, of the correct amount on the books of that company. It contains no reference to rents from the Wolcott, Beers & Grant Horse & Mule Company unpaid since September, 1914, which item was interlined in the amount of $21,-603.04 on the books of the Guyton & Harrington Mule Company under date of January 1, 1916, and shown on books of the Stock Yards Horse & Mule Company under date of February 29, 1916. It contains no reference to profits of Biddle & Company, a trade name under which the Stock Yards Horse & Mule Company did business, and the only evidence that Wolcott knew anything about this business was Biddle's statement that he visited Wolcott a few times and read him some figures from a private memorandum book which he had lost a short time before the trial. It contained no reference to profits of Gilroy and Grant amounting to $55,000, or more, which admittedly belonged to the Stock Yards Horse & Mule Company.

Exhibit 500 falls far short of proving that Wolcott was fully advised as to the true value of his interest in the joint adventure, or even accurately advised regarding the value of his interest in the Stock Yards Horse & Mule Company, and the evidence cited as supplementary proof is unconvincing. It is no answer to say that there were records then in existence from which he might have obtained this information. His physical inability to have done so in person is not seriously questioned. His confidence in and utter reliance at that time upon Rozzelle to inform and advise him in this matter is apparent. His co-adventurers were not only business associates,

but also friends of long standing. He had a right, under all the circumstances as he evidently understood them, to expect from these associates and Rozzelle the utmost good faith and a full disclosure of all the profits of the joint adventure the existence of which has already been determined. If Wolcott is to be believed, and we think he is, the information Rozzelle furnished him was incomplete and misleading. It appears from the evidence that in effecting this sale Rozzelle acted as attorney for Guyton and not for Wolcott. Apparently the only compensation he received was that subsequently paid by these two Guyton controlled corporations. No doubt Rozzelle spoke the truth when, as Wolcott says, he afterwards told him that he was not acting as his attorney and there was no record that he had ever charged him anything. If this was the true relation that existed then Guyton was party to its creation and knew of the limited scope of the information that went to Wolcott. In his deposition he claimed that his offer for Wolcott's interest was "very liberal," but at the same time said: "We never figured what his individual profit was worth." At the trial he repeatedly said that Rozzelle was Wolcott's attorney, that he had no attorney, and that he never saw Wolcott after his return from California. His attitude at this time toward Wolcott, who had been his friend and close business associate for fifteen or twenty years, is somewhat revealed in his deposition where he says with reference to Wolcott's interest: "I thought we ought to buy it and get Mr. Wolcott out, his health failed and he wasn't doing anything, we paid him $10,000 a year salary, and had paid it seven or eight months, it looked to me like we ought to buy his stock if we could agree and get an active man in to do the work." But instead of getting such a man into the business he merely shared the fruits of his bargaining with Beers and Harrington, who under the evidence do not stand as innocent purchasers, Beers being finally accorded substantially what he would have received under the terms of the joint adventure. Guyton's thought, even at the trial, seemed to be that he could safely deal on his own terms with Wolcott, at arm's length and as with a stranger to whom, notwithstanding his physical infirmity and full confidence in Rozzelle, he owed nothing in the way of seeing that he was fully informed of their far flung business activities with which he had been out of touch for so long. This was a mistaken idea. Such is not the law either of partnership or of joint adventure. As said in Meinhard v Salmon, 249 N. Y. 548, and quoted with approval in Claude Neon Lights v. Federal Electric Co., 236 N. Y. Supp. 692, 697:

"'Joint adventurers, like copartners, owe to one another, while the enterprise continues, the duty of the finest loyalty. Many forms of conduct permissible in a workaday world for those acting at arm's length, are forbidden to those bound by fiduciary ties.'"

The general doctrine here applicable has already been stated. Other cases in point are: Brooks v. Martin, 2 Wall. 70; Goldsmith v. Koopman, 152 Fed. 173; Foster v. Callaghan & Co., 248 Fed. 944, 947; Reid v. Shaffer, 249 Fed. 553, 561; Saunders v. McDonough, 67 So. 591, 593; Reece v. Rhoades, 165 Pac. 449, 453; Modlin v. Licht, 224 N. Y. App. Div. 614, 615; Goss v. Lanin, 170 Iowa, 57, 65; Nelson v. Lindsey, 179 Iowa, 862, 866. Deceit may be negative as well as affirmative. It may consist in the repression of that which it is one's duty to declare as well as by the declaration of that which is false. [MacDonald v. Roeth, 179 Cal. 194, 199.]

Without further discussion of the conflicting evidence and opposing arguments on this issue we deem it enough to say that plaintiff's plea of fraud is sustained by the weight of the credible evidence and the purported sale made by Wolcott to J. D. Guyton on March 1, 1916, was properly set aside and for naught held by the trial judge.

Attending to other questions presented under head of respondents' points and authorities, we find no merit in defendants' plea of the Statute of Limitations, Section 1317, Revised Statutes 1919. This defense does not begin to run until "discovery by the aggrieved party, at any time within ten years, of the facts constituting the fraud," and under the pleadings and proof this did not occur until from two to six months prior to January 18, 1922, when plaintiff filed suit. We have already reviewed the facts and circumstances which prevented an earlier discovery by plaintiff. They distinguish this case from Brown v. Irving-Pitt Mfg. Co., 316 Mo. 1023, 292 S. W. 1023, and other cases cited by respondents. This suit was timely brought and respondents' charge of laches must also fail. [33 C. J. sec. 85, p. 867; Munson v. Fishburn, 183 Cal. 206; Seligson v. Weiss, 227 N. Y. Supp. 338; Dexter & Carpenter v. Houston, 20 Fed. (2d) 647, 653; Monmouth College v. Dockery, 241 Mo. 522, 145 S. W. 785.] In the latter case, pp. 551, 552, we said:

"Defendant insists that it is not sufficient to avoid the Statute of Limitations for the plaintiff to show that it did not discover the fraud until December, 1905, but it must also show that it used due diligence to discover it, and defendant says that the plaintiff in its pleadings and proof only shows that it did not discover the fraud until that date; therefore, the statute is not avoided.

"Fraud is a very subtle subject, it is cunningly devised and artfully perpetrated; concealment is in its very essence. The law does not presume fraud, it does not require of one that he should suspect fraud in every transaction; and, although it requires him to be reasonably watchful of his own interests and will not relieve him if he has been negligent in that respect, yet the mere fact that a transaction turns out after a length of time to have been fraudulent, does not put

the victim beyond the pale of the law. If there was nothing in the transaction at the time, or nothing occurring later, to cause a reasonably prudent man to suspect fraud, he is not guilty of negligence in failing to ferret it out.''

The agreement of joint adventure as pleaded and proved is not contrary to public policy and the laws of this State. Nor does any question of *ultra vires* arise under the pleadings and proof. Equity will not permit such a defense where the contract has been fully executed and the corporation has received the full benefit of the performance. [Thompson on the Law of Corporations (2 Ed.) sec. 8380; Mestier & Co. v. Chevalier Paving Co., 108 La. 562; Boyd v. American Carbon Black Co., 182 Pa. St. 206, 210, 211; Dexter & Carpenter v. Houston, 20 Fed. (2d) 647, 653; Allan v. Hargadine-McKittrick Dry Goods Co., 315 Mo. 254, 286 S. W. 16, 19; National Bank of Commerce v. Francis, 296 Mo. 169, 196, 246 S. W. 326.]

Plaintiff was not bound to tender back what he had received before rescinding the contract of sale and seeking an accounting. The undisputed evidence shows that the value of plaintiff's interest exceeded $340,000. The business organizations mentioned in the contract had been dissolved and it was impossible for defendants to put plaintiff *in statu quo*. In such cases tender is unnecessary. [Parish v. Casner, 282 S. W. 392, 412; Page Belting Co. v. Prince, 77 N. H. 309, 313; Stuart v. Hayden, 72 Fed. 402; 2 Pomeroy's Equity Jurisprudence, sec. 910; Williston on Contracts, secs. 1526-1530.]

When Wolcott learned of the fraud two remedies were open to him. He could affirm the contract and sue at law for damages sustained, or he could repudiate the contract and sue in equity for its rescission. He pursued the latter course and prevailing therein he was entitled to an accounting for the ascertainment of his share in all of the profits that were earned during the entire period of the joint adventure, which we find from the evidence extended from on or about September 1, 1914, to on or about February 21, 1918.

On the issue of accounting, as presented by the whole record, we are unable to follow the reasoning and conclusion reached by the trial judge, or to determine the exact amount of profits of the joint adventure and the true status of the joint adventurers' participation therein. We see no occasion for a new trial on the issues of joint adventure agreement and fraud. It follows that the successor judge erred in sustaining defendants' motion for a new trial of the whole cause. However, upon the evidence now before us we cannot intelligently review alleged errors as to the accounting or finally dispose of that issue ourselves by entering the proper judgment. In such

case the cause should be remanded for a new trial on that issue only. [Sec. 1063, R. S. 1929; State ex rel. Allen v. St. L. Cir. Ct., 41 Mo. 574, 581; Chouteau v. Allen, 74 Mo. 56, 59; Rees v. McDaniels, 131 Mo. 681, 33 S. W. 173; Donnell v. Wright, 199 Mo. 304, 312, 97 S. W. 928; Turner v. Anderson, 236 Mo. 523, 543, 139 S. W. 180; McLure v. Bank of Commerce, 252 Mo. 510, 524, 160 S. W. 1005; Schroeder v. Edwards, 267 Mo. 459, 486, 184 S. W. 108; Block v. U. S. Fid.. & Guaranty Co., 316 Mo. 278, 308, 290 S. W. 429.]

It is therefore ordered that the order of the successor judge granting a new trial be reversed, and that the cause be remanded for such further proceedings as may be necessary to determine the issue of accounting only, and upon the completion thereof that proper judgment be entered by the trial court in accordance with our findings hereinabove stated on other issues and in accordance with the facts then found on this issue. All concur, except *Henwood* and *Ellison,* *JJ.,* not sitting.

## On Motion for Rehearing.

ATWOOD, J.—In their motion for a rehearing respondents insist that under the pleadings appellant is not entitled in any event to participate in profits made in the business of furnishing horses and mules to the British Government and other belligerent allied powers engaged in the World War after March 1, 1916, the date of the sale agreement between J. C. Wolcott and J. D. Guyton. A brief survey of the record pertinent thereto will disclose the fallacy of such a claim.

Plaintiff's amended petition alleged that it was "agreed that the said joint adventure should continue as long as said corporations, partnerships or trade organizations, or any of them would be engaged in the business of supplying horses and mules to the British Government or to any of the allied or associated powers engaged in the War." It also contained the following allegation: "Said joint adventure continued from on or about the 1st day of September, 1914, to on or about the first day of January, 1918, at which time said business of supplying horses and mules to the belligerent, allied and associated powers was terminated."

Defendants filed a motion to strike. The first paragraph of that motion sought to strike the amended petition from the files on the ground that the cause of action therein pleaded was a departure from that pleaded in plaintiff's original petition. The second paragraph sought to strike from said amended petition the allegations above quoted, and another allegation specified in said motion, all on the grounds that they contradicted "important facts alleged and pleaded in said original petition" and constituted a departure. Defendants' motion to strike was overruled as to the first paragraph. As for the

second paragraph, it was overruled as to the allegation first above quoted and sustained only as to the allegation last above quoted. It does appear that in connection with these rulings the court said:

"The other paragraph which I read: 'and it was further agreed that the said joint adventure should continue as long as said corporations, partnerships or trade organizations, or any of them would be engaged in the business of supplying horses and mules to the British Government or to any of the allied or associated powers engaged in the war,' is in reality immaterial and the motion to strike out will be overruled, because the adventure was dissolved, as stated in the original petition, March 1, 1916, and Mr. Wolcott retired therefrom upon the payment of that consideration, or as it is alleged in the amended petition that on that date he sold and transferred to Guyton all his interest in the joint adventure and in the corporations. The accounting, if an accounting is to be had, is of the net profits prior to that date.

"The order will go accordingly."

However, the record before us shows that subsequently, and before any testimony was taken in the case, the court said:

"The court heretofore, upon motion of the defendants, made an order striking from the amended petition the following language, upon page 4, in Paragraph 5 thereof: 'said joint adventure continued from on or about the first day of September, 1914, to on or about the first day of January, 1918, at which time said business of supplying horses and mules to the belligerent allied and associated powers was terminated.' The motion asserted that the above allegation was a departure from the original petition and in direct conflict with the allegations of the original petition in which it was stated, paragraph 4: 'said joint adventure continued from the first day of September, 1914, to March 16, 1916, at which time it was dissolved.' It is also alleged that such dissolution was brought about by the defendants' taking advantage of the then physical condition and illness of the plaintiff to so dissolve the joint adventure and defraud the plaintiff, as afterwards stated in the petition.

"In the amended petition, the plaintiffs are asking in brief, for such relief as they may be entitled to under the law and the same is true of the original petition.

"The court, in passing upon the motion heretofore in what was said at that time, does not want to be understood as passing upon the question as to the measure of the plaintiff's damage, or recovery, under the original or amended petition. If the plaintiff, either under the original or the amended petition is entitled not only to the profits accrued at the time the settlement was made with the plaintiff on either March first or March sixteenth, 1916, and in addition thereto for the unlawful and wrongful settlement and dissolution of the

joint adventure that matter has not been presented and has not been passed upon.

"The court is of the opinion that the allegations stricken from the amended petition are not vital or material to the issues and with such allegation being stricken out, they are still entitled to whatever relief, under the law and in equity, they could recover under either the original or the amended petition, and the motion to set aside the order heretofore made will be overruled and excepted to."

Respondents make no allusion whatever to the court's final ruling last above quoted, although it further appears from the record that the case was tried throughout on allegations of the amended petition sufficiently broad to set at naught their present contention. By answering over and proceeding to trial defendants waived their plea that the cause of action stated in plaintiff's amended petition constituted a departure. [Crecelius v. Ry. Co., 284 Mo. 26, 223 S. W. 413; Schroeder v. Edwards, 267 Mo. 459, 482, 184 S. W. 108; Castleman v. Castleman, 184 Mo. 432, 440, 83 S. W. 757; and Scovill v. Glasner, 79 Mo. 449, 454.] In this state of the record respondents are not entitled to treat the case as having been tried on plaintiff's original petition.

Closely related to the foregoing contention, and likewise barred from our consideration by the state of the pleadings, is respondents' claim on motion for rehearing that rescission of the sale contract of March 1, 1916, pleaded in the amended petition, should not be regarded because plaintiff pleaded and therefore elected to pursue an inconsistent remedy in his original petition. It is unnecessary for us to determine whether or not the original petition should be so construed. Election of remedies must be pleaded. [20 C. J. 37, sec. 32; Bartlett v. McCallister, 316 Mo. 129, 143, 289 S. W. 814; Powell v. Dorton, 321 Mo. 639, 12 S. W. (2d) 453, 458.] The amended answer upon which defendants finally stood contained no such defense. Therefore, it cannot now be considered.

Other questions raised in respondents' motion for a rehearing insofar as they relate to all issues except that of accounting, upon which issue alone the cause is remanded, are sufficiently dealt with in the principal opinion. The motion for rehearing is overruled.

All concur, except *Ellison* and *Henwood, JJ.*, not sitting.